(No. 17907.—

THE CHICAGO TITLE AND TRUST COMPANY, Admr., Appellee, *vs.* CHARLES W. WARD, Exr., Appellant.

*Opinion filed October 25, 1928.*

Montgomery, Hart & Smith, (Louis E. Hart, and Irving Herriott, of counsel,) for appellant.

Fisher, Boyden, Kales & Bell, (Darrell S. Boyd, of counsel,) for appellee.

Mr. Commissioner Crow reported this opinion:

This cause was formerly before the court and is reported in 319 Ill. 201. Upon remandment to the Appellate Court for the First District that court reversed the judgment of the circuit court of Cook county and rendered judgment for damages in favor of the claimant, the administrator of the estate of Harriot Benton Ward, deceased, and against the estate of George C. Benton, deceased, for the conversion of 350 shares of stock of the Delta and Pine Land Company. Pursuant to the mandate of this court, the Appellate Court, finding the facts differently from the trial court, incorporated in its judgment a finding of facts and found the issues for appellant in that court, and that Ben-

ton gave outright to his daughter, Harriot Benton Ward, 350 shares of the capital stock of the Delta Company; that they belonged to her in her lifetime and upon her death to her estate, and that at the date of the conversion thereof the stock had a reasonable value of $200 per share; that the administrator ought to have and recover of and from Charles Ward, executor of the last will of Benton, the damages by it sustained by reason of the premises, concluding with a judgment for such appellant for the value of the stock, with interest thereon from the date of the conversion, February 21, 1898. A certificate of importance was granted and an appeal allowed to this court.

On November 12, 1895, George C. Benton purchased 350 shares of the capital stock of the Delta Company, paying therefor $11,000. He delivered to the company the four certificates representing those shares. By his direction it issued in lieu thereof certificates representing the shares in the name of his daughter, Harriot, and they so remained on its books until after her death, April 18, 1896. The certificates were never delivered to her, though her father told her he had bought the stock for her. On February 28, 1898, Benton sent the certificates representing the 350 shares to the office of the company with instructions to the secretary to transfer the stock and to issue new certificates in the name of George C. Benton. The transferred certificates purport to have been indorsed by Harriot, but her purported signature is admitted not to be in her handwriting but in the handwriting of Benton. The written parts of the assignment and power of attorney on the back of the certificates to transfer the shares are in the handwriting of Benton and bear date January 19, 1898. It is apparent that Harriot did not authorize the transfer of the shares on the books of the company. It is not contended that she did authorize it. The trial court found as a fact by a special finding submitted, "that on or about February 28, 1898, George C. Benton procured the transfer of

the 350 shares of the capital stock of the Delta and Pine Land Company of Mississippi in question, then standing in the name of Harriot J. Benton Ward on the books of the company, to his own name without authority from the said Harriot J. Benton Ward, as record owner of said stock, or without authority from the administrator or heirs of the estate of said Harriot J. Benton Ward." The court held as a proposition of law: "Legal title to the capital stock of a corporation passes by transfer of the shares on the books of the company to the transferee, irrespective of whether or not the stock certificates are delivered to the transferee." The court refused to hold "that at the date of her death (April 18, 1896,) she was the owner of 350 shares of the capital stock of the Delta and Pine Land Company of Mississippi, standing in her name on the books of the company and represented by certificate 83 for 100 shares, certificate 84 for 100 shares, certificate 85 for 100 shares and certificate 86 for 50 shares."

It is contended that the finding of the Appellate Court incorporated in its judgment is a conclusion of law and not a finding of facts. Whether the stock belonged to Harriot during her life and to her estate after her death is a complex fact—a blending of facts established beyond controversy and the law applicable to the facts. Upon the conceded facts the propositions of law and fact held by the court required a finding that Harriot's estate was entitled to recover damages from Benton's estate because of his wrongful conversion of the stock, yet the court reached the conclusion that neither she nor her estate was the owner of the stock represented by the certificates standing in her name on the books of the company at her death and for nearly two years thereafter, at the time of their conversion.

As to the ownership of the 350 shares of the Delta Company stock, the uncontroverted evidence shows (1) that on November 12, 1895, George C. Benton, who was president of that company and owned 2518 shares of the total capi-

tal stock of 6000 shares, caused to be issued in the name of his daughter, Harriot, 350 shares of the company's stock, paying therefor $11,000; (2) that, representing that purchase, four certificates of the company, all dated November 12, 1895, were issued by the company in her name; (3) that the stubs in the stock book recite that those certificates for 350 shares were issued to her on November 12, 1895; (4) that the stubs recite that on February 26, 1898, nearly two years after the daughter's death, those certificates were received by the Delta Company and canceled and new certificates in similar amounts issued to Benton; (5) that each of the four certificates issued to her contains on the back what purports to be an assignment to Benton dated January 10, 1898, nearly two years after her death, signed "Harriot J. Benton Ward," which signature was either written by Benton or by someone under his direction; (6) that she knew that her father had put 350 shares of the Delta Company stock in her name, as her father told her so; (7) that in writing her name on the back of the certificates purporting to constitute assignments, Benton, or the person writing the name, undertook to make the signature appear to be written by someone other than Benton; (8) that the trial balances in the records of the personal account of Benton which he constantly kept did not show that he had purchased the 350 shares for himself; (9) the books of the company thereafter, and until the attempted transfer to Benton, showed her to be the owner of the stock.

The preceding resume of the facts is the basis for the finding of the ultimate fact by the Appellate Court in its judgment of reversal that Harriot in her lifetime, and her estate after her death, was the owner of the shares of stock by gift. So far as the facts of gift and ownership are involved, they are ultimate facts. It is true that ownership is a mixed question of law and fact. It involves the question of what was done in passing title or ownership, and

the legal effect attached to what was done. But the judgment of the Appellate Court is not, as contended, ineffectual because it is the finding of a mixed question of law and fact. The judgment or decree of any court is sufficient if it finds the ultimate facts essential to sustain it. It is not necessary that it recite the evidentiary facts. (*Cobe* v. *Bartlett,* 270 Ill. 61; *Stevenson* v. *Earling,* 290 id. 565.) The finding of an ultimate fact, as ownership, (*Koch* v. *Arnold,* 242 Ill. 208,) is often a conclusion drawn from the evidentiary facts and the application of legal principles may be required to reach the conclusion, thereby making the conclusion a mixed one of law and fact. Findings of the Appellate Court on mixed questions of law and fact are binding on this court. *Stevenson* v. *Earling, supra; Roemheld* v. *City of Chicago,* 231 Ill. 467; *McGovney* v. *Village of Melrose Park,* 241 id. 142; *Cobe* v. *Bartlett, supra.*

The contention that the gift was not complete because there was no delivery rests upon the fact that Benton did not deliver to Harriot the certificates of stock issued in her name. No case has been cited holding that a transfer of shares of stock on the books of a corporation in this State will be overcome as a muniment of legal ownership where the certificates are retained by the donor or vendor. It is generally held that possession of the certificates confers an equitable title to the shares represented by them and will support an action to have the stock transferred on the books. It is also true that the transfer on the books confers the legal title to the shares. But no case of all those cited and examined has announced the law to be that, the rights of third persons not being affected, the legal title to the stock is not complete, wherever the certificates may be or by whomsoever held, as between the parties, if registered on the books of the corporation. Cases involving the rights of creditors, and their superior rights, are not authority affecting the rights of donor and donee. If the authority to transfer were genuine,—not forged,—on presentation of

the certificates for transfer on the books the corporation would be required to make the transfer, because the legal title follows the equitable title. Owners of shares of stock, and those in privity with them, cannot be deprived of the beneficial ownership by the means employed in this case. The doctrine announced by this court in *People* v. *Lihme,* 269 Ill. 351, is applicable in determining the legal effect of the transfer of stock from Benton to Harriot: "When Mrs. Carus assigned to the appellee the one share of stock which she owned and it was transferred to him on the books of the company and the certificate was issued to him for it he became a stockholder of the company. He was vested with the entire legal and equitable title, subject to the terms of any agreement by which he was bound. He still has such title except to the extent that he has voluntarily parted with it. The title could pass from him only by the surrender of his certificate and a transfer on the books of the company. He could confer an equitable title upon an assignee by a delivery of the certificate, with the blank assignment and power of attorney thereon signed by the appellee, but the legal title would still remain in the appellee until a transfer was made on the books of the company.—*Otis* v. *Gardner,* 105 Ill. 436." In the *Otis case* it was held that the equitable title to shares of stock pass by signing the blank assignment and authorizing the transfer of the shares on the books of the corporation and that by such transfer the legal title passes.

There are a number of cases in the Appellate Court holding that a transfer of stock on the books of the corporation passes the legal title. While those opinions are not authority here, that in *Colton* v. *Williams,* 65 Ill. App. 466, written by the late Justice Cartwright, is a clear statement of the rule. Upon the peculiar facts of that case Judge Cartwright said: "A share of stock is defined to be the right which its owner has in the management, profits and ultimate assets of the corporation. (Cook on Stock and

Stockholders, sec. 5.) The shareholder acquires the right to participate, according to the amount of his stock, in the management of the corporation, its dividends, and its assets remaining on dissolution of the corporation, after the payment of debts. The title to stock is created by registry in the books of the corporation. The certificate is not the stock itself but only evidence of the ownership of the stock. It has value only as such evidence, and apart from the shares which it represents it is worthless. It is not essential, and a registered stockholder may exercise all his privileges without it. He had power to transfer his stock, to receive dividends and to vote, and he is individually liable as a stockholder although without the usual voucher in the form of a certificate. (Cook on Stock and Stockholders, sec. 10; Beach on Private Corporations, sec. 972.) * * * The parties to the transfer were living together as husband and wife, and the natural place of deposit of the certificates was in the iron safe in the store, whether the stock was owned by him or her. Whether the finding of the certificate in that place was sufficient to justify a conclusion that it had never been delivered and overcomes his statement that he had given the stock to her we deem it needless to inquire, since the delivery of the certificate was not essential to the transfer."

In *Roberts' Appeal,* 85 Pa. St. 84, deceased purchased corporate stock and had the certificates issued in the name of his niece without her knowledge and without delivering them to her. After his death the certificates were found among his papers in an envelope indorsed with his name and her name. Holding that the title to the shares passed to her by the transfer upon the books though she knew nothing of the gift, the court said (p. 87): "The gift is complete by the delivery of the thing itself, for transferring the shares to her upon the books of the company is putting her in complete possession of the thing assigned and clothing her with the complete legal title. It stands in the place

of delivery. Such an act performs precisely the office which an actual delivery would perform if it were a chattel. It is as complete a delivery as the nature of the thing will admit of. There can be no clearer evidence of a design to part with the right of property in favor of another than an absolute transfer of the legal title to her for her own use. Retaining in his possession the certificates which are in her name, and which he could not use without her consent, cannot undo or qualify the decisive ownership with which he had invested her by the actual transfer to her on the books of the company. The best evidence of her ownership is the transfer on the books of the company. The certificates were but secondary evidence of her ownership and only useful for the purpose of transfer. They were nothing more than the official declaration by the company of what already appeared on their books. There was no *locus pœnitentiæ*. He could not have used the certificates, nor could anyone have used them except Miss Foster." See, also, *Osgood* v. *Skinner*, 211 Ill. 229.

So far as the question has been considered, this court is committed to the doctrine that a transfer of shares on the books of the corporation passes the legal title to the person named in the stock certificate. The certificate being only secondary evidence of title and not necessary, the transfer on the books at the instance of the donor being the best evidence of delivery of which the gift is susceptible, no other rule is compatible with the principle of protection of the donee against retraction of a completed gift. The fact that Benton was the largest stockholder of the corporation cannot, as seems to be contended by appellant, change the principle and permit shares of stock to be transferred differently, or with different legal effect, than if he had a certificate for only one share. The certificates held by him being evidence only of what the corporation records disclosed, they have no greater legal effect than those held by any other stockholder. The books disclosed the legal owner

of the shares. It is only by transfer by the owner on the books of the corporation that those responsible for the honest and business-like management of the corporate affairs may be guided. The title of Harriot to the shares of stock being complete at her death, it seems axiomatic that those in succession to her title cannot be deprived of it by the method pursued.

The contention that the proceedings in the lower courts were equitable proceedings, and therefore the Appellate Court was not authorized to find the facts, is untenable. The shares of stock having been given by Benton to his daughter and the "donative intent" evidenced by having the shares purchased for the purpose transferred upon the books of the corporation in her name, the legal title thereto passed to her. She had not, as in some of the cases found in the Reports, signed a transfer in blank and retained the certificates in her hands or delivered them to Benton. There is no more reason for saying that his act of writing her name to the transfer after her death, when she could neither assent nor withhold assent, can be effectual to deprive her estate of the value of the shares and that the case is governed by equitable principles, than if it had been done by any other person. It seems too elementary to require discussion that he could not revoke a gift in that manner if she were living. Her death two years before the transaction renders a revocation legally impossible. That event terminated the *locus pœnitentiæ* of the donor discussed in decided cases in the briefs and the gift was beyond retraction.

The judgment of the Appellate Court is in consonance with the law and is affirmed.

Per Curiam: The foregoing opinion reported by Mr. Commissioner Crow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*