The dispute in this case raises a question as to the ownership of certain shares of the capital stock of the McAllister Coal Company, as well as of R. McAllister, both New Jersey corporations.
It is conceded that prior to April 1st, 1933, complainant was the owner of one hundred and twenty shares of the capital stock of the coal company and also the owner of thirty shares of the capital stock of R. McAllister, but it is denied that he owned any additional shares in the R. McAllister company. This denial raises a question as to shares of stock represented by stock certificate No. 9 for eighty shares in R. McAllister, issued to John McAllister on December 1st, 1923, which certificate was admittedly assigned by him in blank and thereafter transferred on the books of the McAllister company to Richard McAllister, Jr. It also appears that a stock dividend of fifty per cent. was declared and that whoever was the owner of the eighty shares originally represented by certificate No. 9 aforesaid is also the owner of the additional forty shares by reason of the stock dividend.
Taking up the question of the ownership of the thirty shares of R. McAllister and the one hundred and twenty shares of stock in the coal company, admittedly standing in the name of the complainant prior to April, 1933, this stock was sold by virtue of an execution issued on a judgment of the McAllister Coal Company against complainant.
Complainant attacks the validity of the judgment of the McAllister Coal Company and subsequent proceedings through which the defendants claim complainant's ownership of this stock was transferred to the McAllister Coal Company.
The undisputed evidence is that the McAllister Coal Company, claiming that complainant was indebted to it on a book account, instituted suit against complainant in the Atlantic County Circuit Court; that the summons and complaint therein were served personally on complainant; that he filed no answer and entered no defense, with the result that on April 27th, 1933, judgment was entered against him in the sum of $8,302.67, besides costs. Execution issued on *Page 396 
the judgment and the sheriff levied on one hundred and twenty shares of the capital stock of the McAllister Coal Company and thirty shares of the capital stock of R. McAllister, all standing in the name of complainant, as aforesaid; that after due advertisement, the sheriff sold these shares of stock at public sale, at which the McAllister Coal Company became the purchaser for the price of $4,500; that thereafter, on May 19th, 1933, the sheriff executed and delivered to the coal company a bill of sale for the stock aforesaid and the stock was transferred on the books of the respective companies.
It is undisputed that all proceedings aforesaid were in strict accord with the law of practice of the court.
Complainant prays that it be adjudged that the judgment aforesaid was obtained by fraud and that defendant or one of them be ordered to cause the judgment to be opened; that the defendant account to complainant; that it be adjudged that complainant is a beneficial owner of the aforesaid shares of stock in both companies and that the defendants have no right, title or interest in any of the stock in question and that they be enjoined from assigning, encumbering or transferring said stock and be ordered to deliver to the complainant "certificates for each and all of the said one hundred and twenty shares of the capital stock of McAllister Coal Company and one hundred and twenty shares of the capital stock of R. McAllister."
The allegations of the bill upon which the charge of fraud is based by complainant are, generally speaking, that before the suit aforesaid was instituted complainant and Richard McAllister, Jr., the latter representing himself, as well as the McAllister Coal Company, of which he was president, knew that complainant did not owe the sum of money demanded; that complainant had been threatened with a law suit by a third person upon an alleged cause of action (breach of promise), known by complainant and Richard McAllister, Jr., his brother, to be unfounded and unjust but "was believed by both to be dangerous and embarrassing to complainant;" that Richard, Jr., for himself and for the coal company, represented to complainant that if no defense to the suit of *Page 397 
the coal company was interposed and if complainant would permit judgment to be taken against him "the complainant would be thereby protected against loss and risk of loss to complainant's stock in the two companies" by reason of the breach of promise suit aforesaid, and Richard, Jr., and the coal company "promised that the said stock would, after danger of action by the said third party should be over, be returned to complainant;" that complainant was inexperienced and had confidence in Richard, Jr., who had large business experience and "relying upon the good judgment and integrity of Richard, complainant permitted the coal company to take judgment, even though he was not indebted to it."
My finding of fact, from the evidence, is that irrespective of the amount of John's indebtedness to the coal company, suit would not have been instituted against him had it not been for the threatened breach of promise action, which was not only threatened but which actually was pending in the Pennsylvania courts; that complainant actually owed the coal company the amount sued for I also have no doubt; that Richard promised John a return of his stock after the breach of promise difficulties had been settled seems to be established by not only John's testimony but by that of Mr. Toppin, an entirely disinterested witness. I further find that Richard is more experienced than John in business affairs and, notwithstanding John's testimony to the contrary, I believe he, John, had confidence in Richard's business ability and judgment. I still find, however, that John is possessed of at least ordinary knowledge of business affairs and that he entered into the agreement with Richard with respect to the coal company suit with full knowledge of what he was doing and that he intended to so conceal his assets as to hinder, delay and, if possible, defeat the suit for breach of promise. I also find that John was not of the idea that there was, in fact, no basis for the breach of promise suit but that he knew of the possibility and probability of an adverse verdict against him. He knew of the "Dear Wife" letter, as well as the other incriminating correspondence in the possession of the *Page 398 
female suitor and he gladly accepted the service of the summons at the suit of the coal company in order to help himself out of his dilemma, and I find that Richard wanted to help John and proposed so to do by bringing suit for the coal company, obtaining judgment and selling John's stock interest in the two companies, with the thought and promise of reinstating that interest after John's troubles had been adjusted.
It is evident that a subsequent judgment creditor could not have discovered any fraud in the procurement of the judgment against John. The books of the coal company, admitted in evidence, show a complete system of bookkeeping and proper entries of charge and credit in John's account running throughout the time covered by the account, and they further show that John's account was handled as were the accounts of all the stockholders in the coal company, i.e., in addition to salaries, the company paid out for them and charged to their accounts items of individual expense. It was a family corporation and so handled and all the family stockholders were indebted to the coal company in large amounts.
Richard denies any agreement with John to enter judgment and sell John's stock holdings in order to hinder or delay the breach of promise suit or to protect John against the collection of a possible judgment, but says that he caused suit against John to be brought on an honest debt due the coal company, but without any promise to return any stock sold under the execution, and with the thought that he would protect the coal company, of which he is the largest stockholder, from outside interference, which would ensue in the event that John's stock be seized and sold on a judgment that might be obtained by others.
Richard had a right to bring suit on an honest claim and to proceed thereon to judgment, execution and sale and by so doing "beat" the other creditors, but he had no right to enter into the agreement with respect to that suit, as alleged by the complainant, and I have already decided that such an arrangement was entered into as between John and Richard *Page 399 
and I base my conclusion on a complete analysis of the testimony given by all the witnesses and place great reliance on the evidence of Mr. Toppin, an entirely disinterested witness, who says: "Q. Did you have any conversation at about the time suit was brought by Richard McAllister in which John McAllister's stock in the McAllister Coal Company or R. McAllister was mentioned? A. Yes, I did. Q. What did Richard say? A. He said he was going to sue John on the book account and attach the stock in the Atlantic City and Camden companies. Q. Anything else? A. Well, I asked at that time why this suit was being instituted and he told me at the time that there was some trouble brewing in respect to John and that he wanted to get this stock out of his name before that trouble started and he said later, after the thing is all straightened out why John would get the stock back."
He says that this conversation occurred before judgment was entered and that after the suit against John was over he had another conversation with Richard, as follows: "A. I don't just recall how the conversation came about, but we were discussing this case and I asked him if he had given John the stock back and he said no. He says `as soon as John straightens himself out I will let him have it.'"
This evidence supports John's testimony as to the arrangement as between himself and Richard and although Richard denies explicitly all of John's testimony as to any such an arrangement, when Richard is asked questions with respect to his conversation with Mr. Toppin he is not explicit. He was asked: "Q. Did you ever make a statement in the presence of or to Mr. Toppin that you were going to turn the stock back to John? A. I don't recall ever making any such statement."
If John did agree with Richard to a sale of his stock in order to defeat, hinder and delay the fair prosecution of a suit against him in the court of a sister state he was guilty of a fraud on that suitor and equity will not ordinarily give him relief.
In Prindiville v. Johnson Higgins, 93 N.J. Eq. 425, the late Chief-Justice Gummere said: *Page 400 
"It is a maxim of equity that a court of conscience will not even listen to a suitor who comes into that tribunal with unclean hands and this doctrine is applicable whenever it appears that the litigant seeks to be relieved of the consequences of a fraud in which he has been an active participant. The courts of this state have steadfastly refused to lend their aid to a wrongdoer either by the enforcement of an illegal contract or by relieving the wrongdoer from the obligations thereof; and this they do, not out of regard for the defendant in the action, but because of their unwillingness to use the powers which were granted to them for the furtherance of lawful ends in aiding schemes which are in their nature venal, or for the purpose of relieving parties from the liabilities which such schemes create. Watson v. Murray,23 N.J. Eq. 257; Todd v. Rafferty, 30 N.J. Eq. 260;Minzesheimer v. Doolittle, 60 N.J. Eq. 394; Gregory ads.Wilson, 36 N.J. Law 315; Hope v. Linden Park Association,58 N.J. Law 627; Wyckoff v. Weaver, 66 N.J. Law 648."
The evidence fully justifies the conclusion that John, the complainant, is not only a "sinner" but that his evil conduct was with respect to the particular matter or transaction in which judicial protection or redress is sought. Neubeck v. Neubeck,94 N.J. Eq. 167.
In Hildebrand v. Willig, 64 N.J. Eq. 249, it was held:
"Courts of equity will not entertain propositions of this character. They say to all persons who desire to make conveyances with intent to defraud either present or possible future creditors: `You make such conveyances at your own risk; you cannot induce the courts to relieve you from the consequences of your fraudulent acts. It is no ground for relief that, although you intend to cheat creditors if occasion should require, the expected occasion did not happen, and your preparation to defraud creditors was therefore unnecessary.'"
Mr. Justice Swayze, in Semenowich v. Melnyk, 93 N.J. Eq. 615,
said:
"Equity will not lend its aid to consummate a fraud, however hard the case may be. The parties have made their *Page 401 
bed; they must lie in it. * * * The rights of fraud-doers are not looked at in the light of the wrong they accomplish but of the wrong they plan."
Notwithstanding the long line of decisions to the above effect, only partially cited herein, complainant seeks to escape under the theory as stated in 2 Pom. Eq. Jur. § 942 (at p. 2000):
"* * * a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more innocent, and may grant him full affirmative relief, by cancelling an executory contract, by setting aside an executed contract, conveyance, or transfer, by recovering back money paid or property delivered, as the circumstances of the case shall require, and sometimes even by sustaining a suit brought to enforce the contract itself, for if this be impossible, by permitting him to recover the amount justly due, by means of an appropriate action not directly based upon the contract. Such an inequality of condition exists so that relief may be given to the more innocent party, in two distinct classes of cases: 1. It exists where the contract is intrinsically illegal, and is of such a nature that the undertakings or stipulations of each, ifconsidered by themselves alone, would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction, and affecting the relations of the two parties, which render one of them comparatively free from fault. Such circumstances are imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like, as a means of inducing the party to enter into the agreement, or of procuring him to execute and perform it after it had been voluntarily entered into."
There is nothing in the evidence in this case that would justify this court in applying the principles above announced for the benefit of the complainant. The agreement between John and Richard to hinder and delay the breach of promise suit did not result, in so far as John is concerned, through imposition, oppression, duress, threats, undue influence or by reason of Richard having taken advantage of John's necessities or his weaknesses. John entered into the agreement with full knowledge of its purpose, as heretofore set forth.
The result is that the relief sought by the complainant as to the one hundred and twenty shares of the capital stock of the McAllister Coal Company and the thirty shares of the *Page 402 
capital stock of the R. McAllister company, sold under execution as aforesaid, must be denied.
This leaves for consideration the eighty shares of the capital stock of R. McAllister and its accumulations by way of stock dividends (originally issued to John under certificate No. 9).
As heretofore noted, this stock was not sold by the sheriff under the aforesaid execution at the suit of the McAllister Coal Company, but Richard claims to own it by gift from his father.
It appears without the possibility of contradiction that this certificate of stock, as originally issued, represented eighty shares out of ninety-nine allowed to John at the organization meeting of R. McAllister and that the stock was not a gift to John from his father but that it was issued to him in consideration of a one-sixth interest in the partnership which had theretofore consisted of John's father, Richard, Jr., John, his mother and two sisters. The R. McAllister corporation was formed for the purpose of taking over and it took over the assets of this partnership and issued to the former partners, each, a one-sixth interest in the stock of the corporation, so that John paid full value for his shares of stock.
John never had actual possession of certificate No. 9, but, at the time of its issuance, at the first meeting of the stockholders of the company, assigned said certificate in blank. He did so because "papa" told him to; he says that all the family usually did as requested by the father, without question. Nowhere in the evidence does it appear why the father should have had John assign that certificate in blank and not the other certificate for the balance of his stock interest. Nor does it appear why, outside of the stock certificate issued to the father for his one hundred shares, all the other former partners received two certificates, one for eighty shares and the other for twenty shares, John's certificates being for eighty shares and nineteen shares, with one of his shares issued to Mr. Toppin in order that he might qualify. Nor does it appear why John's father should have had John assign *Page 403 
eighty shares in blank and not have so requested his other children. It does appear that the father retained physical possession of all the stock issued to the members of his family and that, with the exception of the eighty shares in question, it was in his safe deposit box at his death, the eighty shares having been taken out of the box, presumably on or near the 25th of January, 1925. The recital of the agreement signed by all the partners, under which they each sold their partnership interests to the new corporation, is that each held a one-sixth interest in the partnership, which each sold for one hundred shares of the stock of the new company.
It thus appears that from December of 1923, to January of 1925, this certificate No. 9 for eighty shares of the capital stock of R. McAllister was, according to the testimony of Mr. Toppin and John, always in the father's possession and, they say, in his safe deposit box and, in or about January of 1925, it was taken out, as Richard, Jr., says, because "father told me the stock was mine." Mr. Toppin says that, on January 10th, 1925, he went with Richard to the bank and that Richard took the certificate out of his father's safe deposit box and instructed Mr. Toppin to fill in the blank assignment by inserting his, Richard's name, and that he did so. This was in the father's lifetime, he having died in April of 1926. Both Richard and Mr. Toppin agree, however, that the transaction took place in the Marine Trust Company in Atlantic City, where the father had a safe deposit box, and Richard admittedly did not. It is on this statement of Richard's, that his father told him that the stock was his, that he claims it as a gift from his father.
It might be well to note that the original transaction between John and his father was an assignment from the son to the father and not from the parent to the child. This being so, a presumption of gift is absent.
In Howell v. Howell, 15 N.J. Eq. 75 (at p. 77), the court said:
"Where the purchase is made, and the money advanced by the father, and the title taken in the name of the son, the purchase would be deemed an advancement. The presumption *Page 404 
in favor of the advancement arises not only from the relation between the parties, but from the moral obligation of the father to provide for the son. But where the purchase is made, and the money advanced by the son, and the title taken in the name of the father, the relation of the parties will not defeat the resulting trust."
It might well be that as between John and an innocent purchaser of this stock for value, John, having put his signature to an assignment in blank, would be estopped from asserting ownership against such purchaser, but that is not the situation before me. I have an assignee who knew that John's stock certificate was issued to him for a valuable consideration and who also knew that the certificate was assigned in blank by John and held by the father. This assignee cannot, of course, bind John by alleged conversations with his father, who is now deceased, but if he could the extent of his testimony is that his father told him that John's stock certificate was his (Richard's). The assignee's (Richard's) title to the stock certificate cannot rise higher than the donor's if, in fact, a gift has been proved.
Under the evidence, it is impossible to sustain the transfer from John to his father as a gift inter vivos. The requisites to establish such a gift are too well known to require citation of authority. The first requisite, "a donative intent upon the part of the donor," is absolutely lacking in the instant case. John said he had no such intent and there is nothing in the evidence to justify a finding that he did so intend. It is true that a certificate of stock may be subject to a gift but in order to effect such a result, there must be an intent so to do.12 R.C.L. 942.
But it is said that under the Uniform Stock Transfer act of 1916 (1 Cum. Supp. Comp. Stat. p. 690), title passed from John to his father by John's endorsement of the blank assignment. It is true that the act provides that the title of the transferee of a stock certificate so endorsed "is effectual" even though the transferor "has received no consideration." This is a restatement of the law as ofttimes declared by our courts prior to the enactment of the statute aforesaid and is well *Page 405 
put by Vice-Chancellor Green in Matthews v. Hoagland, 48 N.J. Eq. 455
(at p. 486):
"It is settled that one in possession of a certificate of stock in an incorporated company, accompanied by an assignment in blank, executed by the record owner, with an irrevocable power of attorney, authorizing the transfer of the stock, is presumptively the equitable owner of the shares, whose title thereto cannot be impeached if he has given value for them without notice to any intervening equity. Rogers v. New Jersey Insurance Co., 4Halst. 167; Broadway Bank v. McElrath, 2 Beas. 24; affirmed inHunterdon County Bank v. Nassau Bank, 2 C.E. Gr. 496; MountHolly Co. v. Ferree, 2 C.E. Gr. 117; Prall v. Tilt, 1 Stew.Eq. 479; Delaware and Atlantic Railroad v. Irick, 3 Zab. 321;State, Bush v. Warren F. Co., 3 Vr. 439."
The transfer from John to his father, occasioned by John's blank endorsement, is only effectual to cut out John's title thereto when the certificate of stock is in the hands of a holder for value without notice of John's equities. The protection given is to the holder of the certificate, who would be injured by his reliance on the endorsement, not to one who might have happened to find the certificate and would not thereby be hurt by compelling him to return it to its rightful owner, nor does the statute protect one who, without right, fills in the blank endorsement.
But it is said that John is barred from relief by reason of his long delay in asserting his claim against Richard; that the first demand for the stock certificate was just prior to the filing of the bill of complaint, a period of ten years and up.
Of course, John cannot be charged with being dilatory in making his demand for any greater period than that during which he knew or should have known, by use of ordinary diligence, of the fact that Richard claimed to own the stock. There is no claim that Richard ever told John that he had been given the stock by his father nor that John ever knew of any such happening and John's testimony is that he did not know it. *Page 406 
It might be said that Richard received the dividends during all the years and John should have been put on notice by a reduced dividend check, but this is not so. As heretofore said, R. McAllister was a family corporation and it was customary for the company to pay personal bills of all the family, including income tax, automobile licenses, c., out of the company's funds, charging the amounts to the various stock-holding members of the family and crediting the account with sums representing dividends, when and if paid, so that the actual handling of these amounts by John never came about. He always was indebted to the company and all he ever got was his weekly pay check and he got this check irrespective of his indebtedness to the company, which indebtedness was over $7,000 in 1927. This same condition of overdraft, as it were, existed as to all the other stockholders, including Richard.
It might also be said that at the annual meetings of the stockholders John should have found out his record holdings, but there were no such meetings, until December of 1927, and at that meeting, Mr. Toppin appeared as proxy for John, although a directors' meeting was held about one hour before, when John and Richard both were present. It does appear rather strange that John and Richard, according to the minutes of the directors' meeting, were both present and the only directors who were present, and yet John appeared by proxy; but be that as it may, John was never present at any meeting of the stockholders of the company when, according to the minutes, a list of stockholders was mentioned.
It might also be said that John's inspection of the company's books would have disclosed the transfer, but John says he was never permitted to make such an inspection. This is not denied by Richard or Mr. Toppin.
The fact is that John did not and was not expected to participate in the management of the company. His habits of drink made it impossible. He only wanted his salary check and that is all he ever got. He rendered practically no valuable service to the company and the stockholders did not expect him to. His father had fixed his salary at $5,200 *Page 407 
per year and so the family continued it until 1932, when his salary was reduced by fifty per cent. without any board action but by the order of the president of the company.
I am unable to find anything in the case that put John on notice of the alleged gift of his stock to Richard and I am satisfied that had not his trustees, in an endeavor to reform him, withheld his allowance, he would never have discovered the transaction.
It is said that in this suit this court may not decree that the stock in question is John's because if Richard, Jr., is not the owner by virtue of the assignment, the estate of Richard, Sr., is the owner and that the estate, through proper parties, is not a party to this suit. I think this is partially true but as between John and Richard, Jr., this court may decree that Richard, Jr., has no right or title to the eighty shares and their accumulations and that he be restrained from asserting acts of ownership or disposing thereof by sale or otherwise.
I will advise a decree in accordance herewith.