**SHINSAKU NAGANO v. McGRATH,
Atty. Gen.**

No. 10005.

United States Court of Appeals
Seventh Circuit.

Feb. 26, 1951.

Rehearing Denied April 4, 1951.

C. Lysle Smith, Edward R. Johnston, Chicago, Ill., for appellant.

Harold I. Baynton, Department of Justice, Office of Alien Property, Washington, D. C., Otto Kerner, Jr., U. S. Atty., Chicago, Ill., James L. Morrisson, Geo. B. Searls, Attys., Department of Justice, Washington, D. C., for appellee.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiff, a Japanese alien resident of the United States since 1906, appeals from a judgment dismissing his action, brought under Section 9(a) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 9(a), for the return of 8780 shares of the common stock of The Fuji Trading Company, an Illinois corporation. The stock had been seized by the Alien Property Custodian on February 2, 1943, pursuant to authority conferred on him by the aforementioned Act and Executive Order No. 9095, 50 U.S.C.A.Appendix, § 6 note, 7 F.R. 1971, on the basis of his finding that the shares were the property of plaintiff's wife, Kaku Nagano, whom he found to be a national of a designated enemy country, i. e., Japan. The complaint was drawn on the theory that plaintiff was entitled, as owner, to recover 3105 of the 8780 shares seized, and, as bailee for his wife, to have returned to his possession the remaining 5675 shares. This appeal, however, in-

volves only plaintiff's right to the shares which he claims as his own property, for his right to the possession of the balance of the stock as bailee for his wife is totally dependent on her rights as owner, and those rights have been made the subject of a separate appeal from the dismissal of her independent action for the return of the stock owned by her, decision upon which accompanies this opinion.

Plaintiff was admitted to the United States as a permanent resident in 1906 and has resided continuously since that date in Chicago, where he has engaged in the manufacture and sale of oriental food products. Though in 1912, he caused to be incorporated The Fuji Trading Company, he continued to conduct his business as an individual proprietorship until 1920, at which time it was transferred to the corporation, which has become one of the leading companies in its field. In 1914, the plaintiff visited Japan and was there married. Mrs. Nagano did not immediately return with him to the United States but remained in Japan until after the birth of their daughter, Masako, and then, in 1915, came to the United States, entering as a permanent resident and joining her husband in Chicago, where their son, Shigeo, was born in 1916. A second daughter, Takako, was born in Japan while the Naganos were there on a visit in 1919.

With the passage of the Immigration Act of 1924, 43 Stat. 153, 8 U.S.C.A. § 145 et seq., which made it impossible for plaintiff's daughters, born in Japan and never previously admitted to the United States as permanent residents, to join their parents in this country, it was decided that plaintiff's wife should go to and remain in Japan to care for the daughters, their grandmother, with whom they were then lodged, having become ill, until such time as their marriages could be arranged, and, at the same time, to supervise the schooling of their son, plaintiff being of the opinion that a Japanese education was essential in preparing the son for management of the business which would eventually be his. Plaintiff, meanwhile, remained in Chicago, although he made annual visits to Japan to see his family and to arrange for the importation of supplies and materials to meet the needs of his company during the succeeding year.

In the years subsequent to plaintiff's transfer of the business to The Fuji Trading Company, the corporation's issued stock was from time to time increased until, at the beginning of 1932, there were 10,000 shares outstanding, 6210 owned by plaintiff, 3780 by his wife, and 10 by Mrs. Nagano's brother, Miya, the company's production manager. On January 3, 1932, the corporation declared a 50% stock dividend, directing that 5000 shares be distributed to the stockholders of record in proportion to their respective holdings. This would have entitled plaintiff to a distribution of 3105 additional shares, his wife to 1890 shares and Miya to 5 shares, thus increasing their holdings to 9315, 5670 and 15 shares respectively. The stock was not, however, issued in accordance with the terms of the resolution, but plaintiff, who dominated the corporation to such an extent that the trial court found that "The corporation was for all practical purposes the alter ego of the plaintiff," caused a single certificate for 5000 shares to be issued in the name of his wife, who was then in Japan, thus making her the record owner of 8780 shares. The certificate was never actually delivered to the wife, but was kept by plaintiff, at first in his office safe and later in his safe deposit box. Mrs. Nagano was never informed of the issuance of the certificate and testified that she never knew of its existence. In 1936, the corporation declared a cash dividend of 20 cents per share and, in conjunction with the dividend, the company's journal reflects the payment to Mrs. Nagano of $1756 (20 cents per share on 8780 shares). Her income tax return for 1936 reported the receipt of that amount, but plaintiff testified that the dividend was actually paid in one $3000 check which he deposited in his personal bank account.

At the time of the outbreak of the war with Japan, Mrs. Nagano having not yet returned to this country, the Alien Property Custodian vested the 8780 shares of stock of which she was the record owner, these shares representing the majority of the

company's outstanding stock. The vesting order was issued subsequent to plaintiff's filing of an application for a license for the transfer to him of the 5000 shares represented by the certificate issued in his wife's name in 1932.

At the trial, plaintiff testified that, in 1932, he had no intention of making an immediate gift to his wife of the shares represented by the stock certificate issued in her name and argued that the fact that the certificate had never been delivered to his wife was further evidence that there had been no completed gift to her, but the court, relying on the rule announced in Chicago Title & Trust Co. v. Ward, 1928, 332 Ill. 126, 163 N.E. 319, held that the issuance of the certificate in the wife's name constituted effective delivery and, rejecting plaintiff's testimony on the question of donative intent, concluded that plaintiff had made an effective gift of the 3105 shares he now claims as his own. The court further indicated that, because there were discrepancies in certain statements made by plaintiff in his affidavit submitted in connection with his application to the Treasury Department for transfer of the shares issued in his wife's name and the position he has taken in this litigation, it was of the opinion that he should be denied relief. Finally, the court concluded that plaintiff had no right to the possession of the shares admittedly owned by his wife,—a conclusion which, in view of the wife's assertion of her own claim and plaintiff's abandonment, on oral argument, of his claim asserted as bailee for her, we need not review on this appeal.

■ While it is true that the Illinois court, in Chicago Title & Trust Co. v. Ward, 332 Ill. 126, 134, 163 N.E. 319, 322, stated that "So far as the question has been considered, this court is committed to the doctrine that a transfer of shares on the books of the corporation passes the legal title to the person named in the stock certificate," it should be noted that the Ward case, although decided more than ten years after the adoption in Illinois of the Uniform Stock Transfer Act, Smith-Hurd Ann.St. Ch. 32, Sec. 416 et seq. (1917), involved a transfer which had taken place in 1895, long prior to the passage of the Act, and that the decision, which contains not a single reference to the statute, does not purport to be one under the Act. And while there is, apparently, no authoritative decision considering the statute's effect on the doctrine of the Ward case,[1] the plain language of the statute itself makes it obvious, we think, that the rule announced in that case is no longer the law of Illinois. Section 1 of the Act provides that title to a certificate of stock and to the shares represented thereby can be transferred only by delivery of the certificate properly endorsed or by delivery of the certificate and a separate written assignment or power of attorney, and these provisions are declared to be applicable even though the corporation's articles or by-laws expressly provide that the shares are transferable only on the books of the corporation. Section 10 provides that an attempted transfer of title to a certificate or to the shares represented thereby, without delivery of the certificate, shall have the effect only of a promise to transfer, the enforceability of which is to be determined by the law of contracts. These provisions of the Act are utterly irrecon-

1. In Nolan v. American Tel. & Tel. Co., 326 Ill.App. 328, 61 N.E.2d 876, where a father had 100 shares of A.T.&T. stock transferred to his daughter's name and a new certificate was issued in her name but never delivered to her, the Appellate Court refused to apply the principle, broadly stated in the Ward case, that "a transfer of shares on the books of the corporation passes the legal title" to the transferee, but held instead that where, as in the case before it, the evidence of record negatived the presence of any donative intent on the part of the alleged donor, title to the stock did not pass by virtue of the transfer on the corporate books. The obvious inconsistency between the two decisions was, however, sought to be explained on the premise that, in the Ward case, the court was concerned only with the question of constructive delivery and not with donative intent. The opinion in the Nolan case, like that in the Ward case, contains no reference to the pertinent provisions of the Stock Transfer Act.

cilable with the statement, in the Ward case, that "a transfer of shares on the books of the corporation passes the legal title to the person named in the stock certificate"; to hold otherwise,—to say that a transfer on the books of the corporation constitutes a delivery within the contemplation of the Act,—would be to render meaningless the statutory requirement that there be a delivery even in the case where the corporation has expressly provided that its shares are transferable on its books and by no other method.

The court below, however, though apparently recognizing that the statute requires delivery as well as, and in addition to, endorsement, assignment or transfer on the books of the corporation, was of the opinion that the statute was not applicable to the transaction with which we are concerned. After stating that the statute "designates the methods by which a person whose name appears on a stock certificate as owner may transfer title to the certificate and to the shares of stock represented thereby," it continued: "But the case at bar is not concerned with whether the plaintiff has transferred title to a stock certificate and the shares bearing his name. The question involved in this case is the legal effect of the issuance by the corporation, at the direction of the plaintiff, of a stock certificate in the name of his wife, which certificate represents in part shares originally owned by the plaintiff. In other words, we are not concerned here with the first step in the transfer of stock ownership, namely, the indorsement or assignment of the certificate by the person whose name appears on the certificate to be the owner of the shares. It is this step to which Section 1 of the Uniform Stock Transfer Act applies, and requires delivery as well as indorsement or assignment. This case, however, involves the last step in the transfer of stock ownership, namely, the execution by the corporation of a new stock certificate in the name of the transferee." [85 F.Supp. 368, 370.]

The court's conclusion that the statutory requirement of delivery is not applicable because this case is one involv-

ing the *issuance* of a stock certificate by a corporation rather than the *transfer* of such a certificate from one individual to another overlooks, we think, the dual nature of the crucial transaction in the case at bar. The 5000 shares represented by the single certificate issued in Mrs. Nagano's name exist by virtue of the dividend declaration of January 3, 1932, by the terms of which plaintiff was entitled to 3105 and Mrs. Nagano to 1890 shares. With respect to the 1890 shares to which Mrs. Nagano was thus entitled, the court's conclusion that the statutory requirement of delivery is inapplicable is clearly correct, for her title to those shares arose out of her ownership of the stock which produced them. However, as to the 3105 shares to which the plaintiff was entitled by virtue of his stock ownership and the express provisions of the stock dividend, Mrs. Nagano had no right, title or interest, absent a transfer to her from the plaintiff of his title thereto. Consequently, it becomes clear that, insofar as those 3105 shares are concerned, this case is one involving a *transfer* of title to shares, to which the provisions of the Stock Transfer Act are applicable. It follows that, irrespective of the trial court's finding that plaintiff intended to make a gift of those shares to his wife, the "attempted transfer of title," *i. e.,* the registration of the stock and the issuance of the certificate in Mrs. Nagano's name, "to the shares represented thereby without delivery of the certificate" had the effect only of a "promise to transfer," a promise which is enforcible, if at all, by Mrs. Nagano, not by the Alien Property Custodian, and, thus, that there has been no completed gift of the shares to which the plaintiff was entitled by the terms of the dividend declaration of January 3, 1932.

Having determined that there was, under the Illinois statute, no completed gift by plaintiff to his wife of the 3105 shares here in issue, we turn to the lower court's conclusion that "apart from the gift issue, the plaintiff should be denied relief in equity" and "left in the position where his own actions have placed him." In reaching this conclu-

sion, the court stated that "the fact that plaintiff took income tax advantage in 1936 of the fact that a gift had apparently been made should estop him from now denying the legal effect of what he appeared to have done in 1932 * * *." The court continued: "In connection with estoppel, it should be noted that this action under Section 9(a) of the Trading with the Enemy Act is designated as a suit in equity. Equity traditionally demands that a suitor show clean hands and good faith as a condition to relief. In addition to the fact that the plaintiff was willing to take income tax advantage of the situation, there is a striking discrepancy between the position which he has taken in this case * * * and the position which he took in the affidavit filed with the Treasury Department in 1942," an affidavit which, the court stated, "was made to induce the Treasury Department to allow the plaintiff to receive the entire 5,000 shares * * * and not merely the portion of such shares representing plaintiff's part of the 1932 stock dividend * * *."

Before proceeding to determine whether the court below correctly concluded that the plaintiff should be denied relief because of an estoppel or on the basis of the clean hands doctrine, it might well be observed that the position of defendant herein is not one appealing strongly to the conscience of a Chancellor. Defendant enjoys no such status as would plaintiff's wife, in a suit to procure the delivery to her of the stock certificate representing the 5000 shares, or as would a creditor of the wife who, having extended credit to her in reliance on the registration of the stock in her name on the books of the corporation, was seeking to reach the stock to satisfy his claim against her. His right to the stock is wholly dependent on whether that stock is, in the language of Section 6 of the Trading with the Enemy Act, "property * * * due or belonging to an enemy, or ally of enemy," for the statute provides for the forfeiture of only such property as falls within that category. Obviously a court of equity should be most reluctant in view of equity's oft-expressed abhorrence of forfeitures, to raise an estoppel which would work a forfeiture of the property of one who is neither an enemy nor an ally of an enemy, within the meaning of the Act.

This court has recognized that, as a general rule, the doctrine of equitable estoppel "is applicable only where the party sought to be estopped is guilty of such conduct as amounts to fraud or misrepresentation upon which the other party has relied to his detriment." Universal Gas Co. v. Central Illinois Service Co., 7 Cir., 102 F.2d 164, 169. Here, conceding arguendo that plaintiff's 1936 income tax return misrepresented ownership of the stock in controversy, we find no sound basis for estoppel, for defendant, if he did, in fact, rely upon any of these misrepresentations, has suffered no legal detriment as a result thereof; nor will he suffer any such detriment if the stock is returned to the plaintiff, for he has no right to the stock, apart from the statutory authorization "to receive all money and property * * * due or belonging to an enemy, or ally of enemy," and it has never been contended that plaintiff is either an enemy or an ally thereof. Furthermore, whereas the alleged inconsistency between plaintiff's statement in the Treasury Department proceeding (in which he asked for the transfer to him of the entire 5000 shares represented by the certificate issued in his wife's name) that he had exchanged 5000 shares of stock for the certificate which bore Mrs. Nagano's name and the position he has taken in this suit might well be the basis for an estoppel against him if he had successfully maintained the claim made in the prior proceeding, it has been held that it will not have that effect where, as here, the prior claim was rejected. Asher v. Martin, 100 Cal.App. 217, 279 P. 810, 812.

The unclean hands doctrine differs from that of equitable estoppel in that it is concerned not so much with the *effect* of the party's past acts or conduct as with the *intent* with which the acts were performed. McAllister v. Mc-

Allister Coal Co., 120 N.J.Eq. 394, 184 A. 716, 717. The doctrine, which applies only to willful as distinguished from negligent misconduct, is not, however, applicable to every inconsistent act of a party but to conduct which is "unconscionable" or "morally reprehensible." An expression of public policy, the clean hands maxim is not an inexorable rule, but will be relaxed where public policy would be better served by so doing; and it will not be applied in such a manner as to work injustice or wrong. 30 C.J.S., Equity, § 95, p. 482, § 98, pp. 488–490. In the case at bar, whether the alleged misrepresentations were willful or, as plaintiff insists, merely inadvertent,[2] they cannot, we conclude, in the light of all the pertinent facts, be termed "unconscionable" or "morally reprehensible." Moreover, to apply the doctrine in this case would be to work a forfeiture of plaintiff's property, something which equity is always reluctant to do, and to deprive him of control of the business which he founded and to which, as an American resident he has devoted his life; it would, in short, result in an injustice out of all proportion to the $75 tax advantage which he is said to have secured in 1936.

The judgment is reversed and the cause remanded with directions to enter judgment for plaintiff for the recovery of the 3105 shares in controversy.

On Petition for Rehearing

Defendant, in his petition for rehearing, contends that it was error upon our part to direct entry of a judgment for plaintiff for recovery of 3105 shares of stock of the Fuji Trading Company, for the reason, as he says, that , at the trial, he introduced evidence that the plaintiff's wife was legally entitled to the shares, on the basis of consideration paid by her. Inasmuch as the District Court made no finding on this issue, defendant insists that it remains open and should be disposed of.

We have examined the record carefully and find that it contains no substantial evidence to support an affirmative finding upon this issue and nothing upon which a trial court could base such a finding.

The petition for rehearing is denied.

2. Plaintiff urges that the misstatements contained in the affidavit are attributable to the fact that the corporate books, from which the relevant facts could have been accurately ascertained, were not in his possession but were in the custody of the government at the time he made his affidavit.