## ROBERT E. LOCKWARD

*v.*

## ISAAC L. EVANS and LANE & LOCKWARD CO.

[Submitted June 28th, 1917. Decided July 25th, 1917.]

1. Where one of three stockholders executed a written agreement providing that he would not transfer his shares to an outsider until he had first offered them to defendant at the price offered him for them, it was complete compliance with his contract for the stockholder to offer his shares to defendant at the same price offered by complainant without disclosing from whom the other offer came.

2. Under above stated circumstances, *held* that where defendant had an opportunity to exercise his option and failed to do so within a reasonable time, he cannot subject such stock to a constructive trust in his favor by attempting to exercise the option thereafter, as he would have a complete remedy at law for any injury thereby done to him.

3. A court of equity has power to compel the transfer of stock on the theory that the one seeking the transfer is the equitable owner and is entitled to perfect his legal title to the shares.

On bill, &c.

*Messrs. Raymond, Mountain, Van Blarcom & Marsh,* for the complainant.

*Messrs. Church & Harrison,* for the defendants.

FOSTER, V. C.

This bill is filed to compel the transfer of shares of stock on the books of the defendant company and the issuance to complainant of a new certificate therefor. The answer for the company presents no defence to the action. The answer of the defendant John C. Moore in effect admits complainant's right to the relief sought, and the defendant Isaac L Evans by his answer denies complainant's right to this relief, and by his counter-claim asks that the shares of stock may be transferred to him.

The controversy is between Lockward and Evans and arises out of the following circumstances:

The Lane & Lockward Co., which was organized by complainant's father over twenty-five years ago, is engaged in the manufacture of tobacco at Caldwell in this state; it has a capital of $100,000, divided into one thousand shares, of which six hundred and fifty have been issued and of which Evans owns three hundred and five shares; complainant and his wife two hundred and ninety-five shares, and the fifty shares in question stand in the name of Moore, who has been a salesman of the company for many years, and who purchased these shares years ago from complainant's father for their par value of $5,000. The company is a very prosperous one and for years has earned dividends of about twenty per cent.

Evans is the president and treasurer, and complainant is the secretary of the company, and these two and Moore were its directors.

In the spring of 1913 complainant and Evans had some trouble over the unsuccessful efforts of complainant to have his brother-in-law employed by the company. This matter was not entirely adjusted when complainant left for his vacation. During his absence, and on June 14th, 1913, Evans obtained from Moore an agreement in writing, by which Moore gave Evans the first privilege of purchasing his fifty shares of stock, and he agreed

"not at any time to transfer or assign my said shares to any person, persons or corporations, until after I have first in writing offered them for sale to the said Isaac L. Evans at the same price which outside parties may in writing have offered for the same."

Moore further agreed for the period of five years to vote for such officers of the company as Evans should suggest, and also agreed to give Evans his proxy to vote on the stock at any meetings of the company which Moore was unable to attend. Evans, in consideration of these matters agreed to reserve for Moore from his holdings of stock, fifty shares, "until after I have first in writing offered them for sale to said John C. Moore at the same price which outside parties may in writing have offered for the same."

On complainant's return from his vacation he and Evans re-

newed their disputes, and Evans informed complainant of his agreement with Moore.

Some time in the fall of 1915 one Tansy undertook the promotion of a concern called the Mutual Tobacco Company, which was to purchase the property or stock of a number of companies including the Lane & Lockward Company. Evans, complainant and Moore each gave Tansy an option to purchase their stock at a uniform price. At the same time, Evans made with Tansy, without the knowledge of complainant or Moore, what has been termed "a side agreement," by which he was to receive five thousand shares of stock in the Mutual company, and was elected a vice-president of it; and in consideration was to identify himself with it and perform such duties as its directors might require, at a salary to be mutually agreed upon. This agreement is dated December 8th, 1915, but it does not appear when complainant and Moore first learned of it.

On November 1st, 1915, Moore delivered to Evans a letter in which he notified him that he had an offer of $50,000 for his fifty shares of stock, and he requested Evans to exercise his option to purchase the stock under the agreement of June 14th, 1913, within twenty-four hours. At a conference the following day, complainant acknowledged to Evans that he had made the offer, and that it was a fictitious one and he withdrew it; and they then talked over what they called a "gentleman's agreement," under which they were to divide the stock of the company between them and place qualifying shares in the name of a dummy. Complainant and Moore say that on November 1st, 1915, when the bogus offer of $50,000 was made, complainant also made an offer, which was *bona fide,* of $10,000 to Moore for his stock, but this fact was not made known to Evans.

On November 22d, 1915, Evans wrote Moore that he had been requested to give an option on his stock, and offered Moore, presumably in accordance with the agreement of June 14th, 1913, fifty shares for the same price as that for which he was to give the option. Moore was unable to buy the stock and in return offered his shares of stock to Evans, who, under date of November 27th, notified Moore that he was not complying with the June 14th, 1913, agreement. Two days later Moore wrote Evans that

he had received an offer in writing for his stock at a price of $10,000, without disclosing it was an offer from complainant, adding "and in accordance with the terms of our agreement of June 14th, 1913, I am giving you the first privilege of purchasing these shares." On December 2d Evans wrote Moore, claiming the right to inspect the offer before giving his decision, but he never inspected or asked to inspect the offer. Moore states he accepted this offer of $10,000 at the time that he gave an option on the stock for four months, at complainant's direction, to Tansy for the Mutual company. This appears to have been about December 8th.

On April 10th, 1916, two days after the expiration of the option to the Mutual company, complainant under his offer had transferred to him from Moore the fifty shares of stock for $10,000, paying for the same by his promissory note, on which payments have since been made, including a payment of $750 received by Moore as dividends on the stock, and credited by him on the note. Complainant as secretary of the company made out a new certificate to himself for the fifty shares and asked Evans to sign it as president and treasurer. This Evans promised to do on the following day, and the next morning he refused to sign the new certificate, giving as his reason that he didn't think the court of chancery would allow him to sign it; and some time later the bill was filed.

From what has been stated, it is apparent that there has been since 1913 an effort on the part of Evans and complainant to secure control of the company; that they have not acted in good faith towards each other, or towards Moore; and that the latter has shifted his allegiance from time to time from one to the other. Evans was the first to attempt to secretly secure the Moore stock, and through it, or through Moore's agreement, to vote as Evans suggested, to obtain control of the company. Complainant on learning of this and of the secret bargain that Evans had made with the Mutual company for a large block of stock and a salary for himself, then secretly undertook to acquire Moore's stock. Moore at this time was apparently under complainant's influence and willingly assisted him in his scheme and enabled him to acquire the stock on easy terms of payment.

The contention that Evans, after Moore by his letter of November 29th, had notified him of the offer of $10,000, was justified in taking no action because Moore had not disclosed the name of the party making the offer, or submitted the offer to Evans for inspection, is not supported by anything in the agreement of June 14th, 1913, on which Evans bases his claim. In fact, it is very doubtful if the terms of this agreement relate in any way to any offer made by complainant or his wife to Moore for the purchase of his stock. They are both stockholders of the company, and this agreement, admittedly prepared at Evans' instance, requires Moore not to transfer his stock until he has first given Evans the privilege of buying it "at the same price which outside parties may in writing have offered for the same." Who were meant by the expression "outside parties," is not stated. If this means parties outside of the company, i. e., not stockholders, its purpose can be readily understood. If it was intended to apply to anyone making an offer for the stock, I do not see why it was used. It may have been employed to satisfy Moore, who was under some obligations to the Lockward family, that the option to Evans would not prevent him from dealing about the stock with complainant who was an "insider" of the company as a stockholder and officer. Whatever the reason for the use of this expression was, I am satisfied that Moore by his letter to Evans of November 29th, performed all that the agreement of June 14th, 1913, required him to do; that Evans after the receipt of this notice did not, within a reasonable time, exercise his privilege of purchasing the stock, and in fact made no attempt to do so until the day of the hearing in open court—long after the sale and transfer of the stock by Moore to complainant had been consummated.

If Evans' construction of the agreement between himself and Moore is correct, he has an ample remedy at law, for the breach of contract which he claims Moore committed by the sale and transfer of the stock to complainant, and I am unable to adopt the view strongly urged on behalf of Evans, that when complainant purchased the stock, with knowledge of the agreement between Evans and Moore, he thereby became a constructive trustee of the stock for Evans and should be compelled to perform

his trust by transferring the stock to Evans.  There might be some force in this contention, if Evans had attempted to exercise his rights under the contract within a reasonable time after Moore's notice to him of the offer he had received for the stock.

The power of the court to compel a transfer of stock on the books of a corporation in a case of this nature has been recognized, and rests on the theory that complainant is the equitable owner of the stock and seeks by the transfer to consummate a legal title.  *Archer* v. *American Water Works Co., 50 N. J. Eq. 33-50; Reilly* v. *Absecon Land Co., 75 N. J. Eq. 71; Morris* v. *Hussong Dyeing Machine Co., 81 N. J. Eq. 256.*

I will advise a decree pursuant to the prayer of the bill.