The instant case was heard by Vice-Chancellor Lewis in December, 1937. Due to his illness, no decision was rendered by him. On June 13th, 1938, the cause was re-referred to me, and counsel submitted it on the record of the facts presented at the hearing. *Page 361 
The complainant alleges: That on or about March 28th, 1931, Edward A. White, now deceased, owned twenty-five shares of stock in the defendant association; that the title to those shares are indicated by book No. 8606, issued by the defendant association; that on or about the date last aforesaid, White assigned the shares to the complainant as collateral security for a loan given to him by it; that the said assignment was made by the execution, and delivery, of a collateral note, by the terms of which the said shares were pledged and assigned, and an irrevocable power of attorney to transfer the same, and also by the delivery to the complainant of the said book No. 8606; that the complainant succeeded to the assignor's rights in the shares of stock; that the shares were afterwards sold to satisfy the indebtedness of White, and were purchased by the complainant; that complainant's interest in the shares was acknowledged by the defendant, and in the face of repeated demands upon the defendant, it, the defendant, refused to register the stock in the name of the complainant.
The defendant association, in effect, denied the complainant's allegations, and says that title to the shares of stock are represented by a certificate of stock issued by it. It admits that it has refused to transfer the shares upon its books, and asserts as a reason therefor, that complainant at no time tendered to it the stock to be transferred. It further states that it holds the shares of stock in satisfaction of an indebtedness due it from White.
Upon making the loan to White, and his consequent execution of the assignment and pledge, the complainant, through its officers, notified the defendant association that the complainant was holding the shares of stock, represented by book No. 8606, as collateral security for a loan. Also, later, on January 5th, 1932, the complainant sent a written communication to the defendant association in which it stated it held the shares of stock as collateral security, and therein inquired as to the withdrawal value of the shares. The defendant replied to that communication by letter as follows: *Page 362 
"Your letter of January 5th received and we note that you are holding as collateral security for a loan Book No. 8606, 25 shares, in the name of Edward A. White. The present value of these shares is $2388.08." (Exhibit C-4.)
On November 2d 1934, the complainant again wrote a letter to the defendant conveying notice of White's assignment of the stock (Exhibit C-5), which was answered by the defendant in a letter dated November 3d 1934, wherein it stated:
"The present withdrawal value of Book No. 8606 in the name of Edward A. White is $2784.48." (Exhibit C-6.)
Subsequently, on August 12th, 1936, the complainant wrote the defendant as follows:
"We are holding as collateral security to a loan certificate No. 8606 for twenty-five shares of your association, in the name of Edward A. White. Will you kindly advise us what the present withdrawal value is?" (Exhibit C-7.)
The loan to White, as it became due, was renewed from time to time by the bank. During the period of the related correspondence, and the renewals of the note, the defendant at no time informed the complainant that a certificate for the stock was in existence, and that it retained the same. It did not question the validity of White's assignment of the stock to the complainant. It will be observed in the above letters, that the defendant referred to the withdrawal value of the "book," c., suggesting the inference that the "book" represented the shares. One of its letters states the "present withdrawal value of bookNo. 8606, c."
On February 20th, 1935, the twenty-five shares became the only collateral security for the indebtedness of White. His note to the complainant bank was renewed solely on the basis of, and in reliance upon, the value of the building and loan shares given to complainant by the defendant association as expressed in the correspondence aforesaid between them. (Case, pages 13, 14.) *Page 363 
White's failure to pay the last renewal note at its maturity, caused the complainant to sell the twenty-five shares of stock. Before the sale, notice thereof was given to White and to the defendant association. The complainant, being the only and highest bidder at the sale, purchased the shares of stock. The defendant never issued a certificate for the twenty-five shares of stock to White. The certificate for the said shares was not removed from the stock register book of the defendant association until after the institution of this suit. J. Archie Thompson, the president of the defendant association, testified that the certificate "had never been delivered to White, but had always been in the possession of the defendant." He also testified that the defendant had foreclosed a mortgage on White's home, and that a deficiency of about $1,400 resulted. Confronted with that deficiency, White, through his attorney, Judge Francis V.D. Lloyd, then entered into negotiations with the defendant association. As a result White assigned to the defendant "his right, title and interest in the twenty-five shares of the Englewood Mutual Building and Loan Association." Those shares had not been pledged with the defendant as security for its mortgage on White's property, from which the deficiency arose. The assignment of the shares by White to the defendant was subsequent to his assignment of the same stock to the complainant.
Counsel for the defendant association, Judge William Seufert, admitted that the defendant association had received notice of the assignment to the complainant; and, he admitted also that the defendant received notice from White's attorney, Judge Lloyd, to the same effect. Judge Lloyd stated "I so advised Judge Seufert." He further testified that he said to Judge Seufert, "that Mr. White would be very glad to assign his right and title and interest in those shares, because it occurred to me that they might be in value over and above the amount which was due to the bank in shares. I said to him that if this was agreeable, if he would prepare the form of assignment and whatever papers he wanted, I would send them to Mr. White and we would close the transaction on *Page 364 
that basis. Judge Seufert did send me the form of assignment to be executed to Mr. Gorham, the treasurer of the association, I sent the assignment, which is the assignment offered in evidence,D-5, to Mr. White for execution. It was executed and we expected to have a general release from the Englewood Building and Loan Association and that closed the transaction."
In accordance with the arrangement with the defendant association, White assigned: "all my right, title and interest in and to Book No. 8606 (original No. 14045) the Englewood Mutual Loan and Building Association, to me and all my right, title and interest in and to twenty-five shares of stock represented thereby and the account represented thereby, and in and to all moneys therein mentioned, with the interest thereon, now due or to become due." (Exhibit D-5.)
The witness, Thompson, president of the defendant corporation, testified as follows: "Q. And by the very language of thisassignment you took an assignment of the book, didn't you? A.No. I took an assignment of the stock. The book represented thestock." (Italics mine.)
The evidence shows that since 1929 no certificates were issued for stock purchased from the defendant association by shareholders. The only physical evidence of ownership of shares of stock in the defendant association appears to be the account book (Case, pages 30, 31). That fact was made known throughout banking circles by the defendant association (Case, pages 51, 52).
The theory of the bill is that complainant's title under the assignment and sale is an equitable title only, as between it and the defendant; and that equitable relief is necessary to have the shares transferred of record and legal title thereby perfected.Lockward v. Evans, 88 N.J. Eq. 530; Morris v. Hussong DyeingMachine Co., 81 N.J. Eq. 256; Reilly v. Absecon Land Co.,75 N.J. Eq. 71; Pilger v. U.S. Steel Corp., 102 N.J. Eq. 506; Bankof Princeton v. Garden Building and Loan Association, 108 N.J. Eq. 143.
White in executing and delivering to the complainant bank *Page 365 
the irrevocable stock power, the collateral note, and his building and loan association book No. 8606, divested himself of every physical indicia of ownership in the said building and loan stock, and he thereby vested title to them in the bank.
Building and loan shares by an assignment in writing alone is sufficient to effect a transfer of title. Tarbox v. Grant,56 N.J. Eq. 199; Curtis v. Crossley, 59 N.J. Eq. 358; 6 C.J.S.1095; Thompson, Corporations § 4331. In Lipscomb v. Condon,67 L.R.A. 670 (W. Va., 1904), the court, among other things, said:
"The shares exist independently of any certificate. They are a species of incorporeal property * * *. A certificate is authentic evidence of title to stock; but it is not the stock itself, nor is it necessary to the existence of the stock * * *.
"A share of stock being an incorporeal right and incapable of manual delivery and the certificate being not more than evidence of its existence and of title to the shares in the holder, it is obvious it may be assigned without a certificate, and in the mode adopted by the defendant here and his transferee. * * *."
The assignment to the complainant bank was for a valuable consideration. Notice of the assignment was forthwith given to the defendant by the complainant. It admitted knowledge. Notwithstanding its attack on the mode of the assignment, the defendant evidently considered the same "mode" good and effective for its own purpose to claim title to the said stock when it took an assignment of all White's right, title and interest in and tobook No. 8606 and in and to twenty-five shares of stockrepresented thereby. It takes an inconsistent attitude and an odd position, of "blowing hot and cold" on the form of the assignment.
The assignment to the complainant is assailed on the further ground that it does not conform to the provisions of section 1 of the Uniform Stock Transfer act, which directs that a "certificate" must be delivered. Since the defendant association never issued a certificate to White, he or his assignee could not deliver it to the defendant association. "Issued" *Page 366 
means emitted or sent forth (Corning v. Meade County Commrs.,102 Fed. Rep. 57, 60); delivered to the purchaser (Yesler v.City of Seattle, 25 Pac. Rep. 1014, 1019 (Wash.); Gage v.McCord, 51 Pac. Rep. 977, 979 (Ariz.); Folks v. Yost,54 Mo. App. 55, 59; Bank v. Village of Suspension Bridge,26 N YS. 98, 100). "Issued" does not mean merely "executed," but it implies "delivery" (Brownell v. Town of Greenwich, 114 N.Y. 518;22 N.E. Rep. 24, 27; Perkins County v. Gross,114 Fed. Rep. 441, 444; Logsdon v. Supreme Lodge of Fraternal Union ofAmerica, 76 Pac. Rep. 292, 293 (Wash.)). Clearly, a certificate which was never removed from the stock book by the association or corporation, is not "issued" within the meaning ascribed to that term.
Again, the defendant association issued certificates in some cases, and not in others; and it has made it known generally in banking circles that a transfer of shares held in it is complete without delivery of a certificate (Case, pages 51, 52). In the case of Harrington v. Interstate Fidelity Building and LoanAssociation, 63 Pac. Rep. 2d 577 (Utah, 1933), the court, among other things, said:
"This certificate is not of the kind to which the Uniform Stock Transfer act is intended to apply. Such accounts may be transferred by delivery of the pass book and other evidences thereof, without any writing. Symbolical delivery is sufficient to effect the transfer."
It should not be overlooked that the certificate in question is not now, nor has it ever been, in the hands of an innocent, bonafide purchaser for value. It still is in the possession of the defendant association. The provisions of the Uniform Stock Transfer act requiring delivery of the certificate, invalidate the transfer only in favor of an innocent bona fide purchaser of the certificate. Section 4 of the act reads as follows:
"The title of a transferee of a certificate under a power of attorney or assignment not written upon the certificate, and the title of any person claiming under such transferee, shall cease and determine if, at any time prior to the surrender of the certificate to the corporation issuing it, an other person, for value, in good faith, and without notice *Page 367 
of the prior transfer, shall purchase and obtain delivery of such certificate with the indorsement of the person appearing by the certificate to be the owner thereof, or shall purchase and obtain delivery of such certificate and the written assignment or power of attorney of such person, though contained in a separate document." (Rev. Stat. 14:8-30.)
The provisions of the act apply to a bona fide purchaser as appears in section 10 of the act, which provides:
"An attempted transfer of title to a certificate or to the shares represented thereby without delivery of the certificate shall have the effect of a promise to transfer, and the obligation, if any, imposed by such promise shall be determined by the law governing the formation of contracts." (Rev. Stat.14:8-36.)
The courts have taken the position that protection is afforded under the uniform act to these obtaining certificates without notice of any intervening equity. Baumohl v. Goldstein,95 N.J. Eq. 597; Edmund Wright-Ginsberg Co., Inc., v. CarlisleRibbon Mills, 105 N.J. Eq. 411; affirmed, 108 N.J. Eq. 206;McAllister v. McAllister Coal Co., 120 N.J. Eq. 394; Parsons
v. Lipe, 158 Misc. 32; 286 N.Y.S. 60, 90; affirmed, 269 N.Y. 630;Goodfellows Associates, Inc., v. Silverman,186 N.E. Rep. 48.
Vice-Chancellor Bentley in Baumohl v. Goldstein, supra, in considering the uniform act, said:
"This act, of course, was designed for the protection of innocent purchasers of stock in the open market or otherwise, and not at all as a shield by one with knowledge of a condition to unconscionably protect himself from the consequences thereof."
This observation of Vice-Chancellor Bentley is applicable in every respect to the instant case. To the same effect is the language of the court in Goodfellows Associates, Inc., v.Silverman, supra, where it was stated:
"It is agreed that the certificates of stock referred to in these documents were not delivered to the plaintiff, were not endorsed, and were retained by Gordon's Shop and George Gordon (X) until they were delivered as collateral security *Page 368 
to the Citizens Finance Corp. (defendant) on June 29th, 1925, under G.L. (Ter. Ed. ch. 155 § 27). These documents were not effective to transfer the title to the shares of stock absolutely or in mortgage or pledge because the certificates were not delivered endorsed in blank or to a specified person. It would follow that the only title vested in the plaintiff, perforce, of these documents, was an equitable title to the stock by way of pledge or mortgage which might be enforced between the parties and against all persons taking the certificates of stock with notice of the plaintiff's equitable right."
The defendant has cited Parker v. Colonial Building-LoanAssociation, 111 N.J. Eq. 49, in support of its position. But in the Parker Case, Vice-Chancellor Fallon held that the "donee" of stock exerted unfair means to obtain an assignment thereof from the "donor," and that he never obtained the certificate by delivery thereof by the donor, and that the transfer was not made as required by the Uniform Stock Transfer act. It is elementary that to make a gift effective, the donor must divest himself of all dominion over and control of the property given. Where the delivery of the certificate is practicable, and the more ready and efficient way of changing the dominion and control over the stock, it is not unreasonable to require such delivery to complete a gift. But in the instant case, the delivery of the certificate by the complainant was not only impracticable but impossible. It was not in the possession of the donor; it was retained in the custody of one who had no title thereto.
The transfer in the instant case was not in the nature of a gift; it was based upon a good and valuable consideration. Many of the states consider that a gift of stock may be made by the execution and delivery of a written assignment alone. Harris v.Harris, 222 Ill. App. 164; Leedham v. Leedham,254 N.W. Rep. 61 (Ia.); Grymes v. Hones, 49 N.Y. 17; Re Cohn,176 N.Y.S. 225; Re Valentine, 204 N.Y.S. 284.
The shares of stock in the defendant association at the time of said transfer or assignment to the complainant, belonged *Page 369 
to White. They were his to do with as he pleased. There were no "strings attached" to his title. The defendant had no lien upon them and no control over them.
Thompson on Corporations, in discussing the provisions relating to the effect that stock shall be transferred only on the books of the corporation and in such form as the directors may prescribe, in section 4346 says:
"But the authorities support the proposition that such provisions found either in the Charter, or in the By-laws of a corporation, are intended only to prescribe a method of transfer, which shall be deemed effectual, as between the corporation and its stockholders, in all matters relating to internal government and management of the corporation. Such provisions are not intended to prescribe a method of transfer which must be observed as between stockholders and third parties."
Morris v. Hussong Dyeing Machine Co., supra, in effect holds that shares of stock are personal property and evidence of the shareholder's rights in the company, and that they are not the property of the corporation. The court there takes the position that while the directors may create by-laws regulating the transfer of stock, such by-laws cannot confer upon the directors discretionary power to refuse a transfer; that such discretion is illegal, in restraint of trade, and is in violation of the right of transfer of personal property.
One of the most recent decisions upon the question under consideration is that of the superior court of Pennsylvania inGuarantee Trust and Safe Deposit Co. v. Tye,196 Atl. Rep. 618, which holds that the Uniform Stock Transfer act is inapplicable to the transfer of installment shares in a building and loan association. The controversy presented therein was between a bank, pledgee of an installment book, and a judgment-creditor of the pledgor-shareholder, by virtue of a garnishment levied against the building and loan association. The court held: (1) that the pledge to the bank was valid, although no certificate was delivered; (2) that the Uniform Stock Transfer act did not apply to installment shares in a building and loan association. The court, inter alia, stated: *Page 370 
"The Uniform Stock Transfer act of May 5th, 1911, P.L.p. 126, as amended, 15 P.S. §§ 301 et seq., does not apply to installment stock of building and loan associations, so as to require the issuance and delivery of a stock certificate to a shareholder as a prerequisite to his acquiring ownership of stock. Even where a certificate of stock is issued, the provisions of the Uniform act of 1911, page 126, section 9,15 P.S. § 309, as to the passing of title as of the time of registration of the transfer, are only for the protection of the corporation and not intended to control the right of a stockholder to transfer his rights to another."
The relief sought for in the bill shall be granted.