(No. 20050.

NELLIE MILLER HERRIN, Appellant, *vs.* CATHERINE MC-CARTHY *et al.* Appellees.

*Opinion filed April 17, 1930—Rehearing denied June 10, 1930.*

WILLIAM R. BACH, and FRANK GILLESPIE, for appellant.

Richard M. O'Connell, and C. B. Hughes, for appellees.

Mr. Justice Dunn delivered the opinion of the court:

Nellie Miller Herrin filed her bill in the circuit court of McLean county to require Richard O'Connell, the administrator of the estate of James Purefoy, deceased, to deliver to her a warranty deed which Purefoy had signed and acknowledged purporting to convey to her three lots in the city of Bloomington, on one of which was the house in which Purefoy lived at the time of his death, and to quiet her title to the lots against the heirs of Purefoy. By their answers the administrator and heirs denied the delivery of the deed, and the heirs filed a cross-bill for an accounting of rents by the original complainant and to quiet title against her. The cause was referred to the master, who reported the evidence with his conclusions recommending a decree in favor of the complainant. Exceptions were sustained to the report and the court entered a decree of dismissal of both the original bill and the cross-bill. The complainant has appealed and the cross-complainants have assigned cross-errors. The question at issue is whether the deed was delivered.

The evidence shows that Purefoy was a bachelor, about seventy-three years old when he died, and he owned and lived in the property in question. He also owned 120 acres of farm land in McLean county and a promissory note for $1500. In May, 1925, he employed the appellant as his housekeeper at five dollars a week, and from that time until his death, which occurred on October 21, 1927, the appellant lived in Purefoy's home as his housekeeper, together with her son, who was about twelve years of age at the time of Purefoy's death.

The evidence in regard to the execution of the deed was given by D. J. Sammon, a lawyer, who had known Purefoy for forty years and had had business relations

with him but never saw the appellant until after Purefoy's death. He testified that he was sitting in Purefoy's car when Purefoy instructed him to draw the deed, saying that he would be up later to sign it. When Purefoy came to the office two or three weeks later to sign the deed Sammon said: "Jim, you are foolish making this deed. This old girl may throw you out and you won't have no home, and I wouldn't do it." Purefoy said: "No, she isn't that kind of a woman. She has been mighty good to me. She has taken good care of me—in fact, better than I ever had in my life." Sammon said, "Well, if she throws you out you still have a couple of nigger shacks you can go to and still have a home." Purefoy said, "There isn't any danger of that." He executed the deed, and referring to it said, "I am going to let her have that and then I am coming up and make my will." This occurred July 10, 1926. The deed was a warranty deed. It was acknowledged before Sammon as a notary public. Purefoy rented a safety deposit box of the American State Bank on September 30, 1927, which he visited on October 4, and the record of the box kept by the bank shows no other time when it was opened. The deed to the home place was found after his death in the safety deposit box, together with the note for $1500. The appellant had the keys to the box but Purefoy had not authorized the bank to permit her to open it, and the contract for the box which was signed by Purefoy provided that only the lessee or his duly appointed deputy or legal representative should have the right of access to it.

Frank Herrin, the appellant's fourteen-year-old son, testified that no one lived in the Purefoy house except his mother, Purefoy and himself. A few weeks before Purefoy died, Frank and his mother were in the kitchen washing the dishes and Purefoy asked what she was doing. She told him and asked him, "Why?" He said, "Never mind; I will tell you after a while." Frank went into the other room and Purefoy helped him with his arithmetic. Mrs. Herrin

finished the dishes, came in, sat down and asked what he wanted. He was sitting and had some keys in his hand, and asked if she knew anything about a deposit box in a vault. She said that she did not and asked him why. He said, "I will explain to you," and handed the keys to her and said: "These are yours. Keep that key and don't let it lay around. Put it in your purse and keep it there. This is your key, and I have made you a deed for this place, and it is in a safe deposit box in the American State Bank. The only way you can get in is to go to Mr. Wochner and he will take you to the man that has the key. He can't get in without you and you can't get in without him." He also said that there was a note in there for $1500 from Father O'Reilly and a few other papers; that the note was hers. She thanked him.

This testimony was uncorroborated except by the facts that after Purefoy's death the appellant had the keys; that in his lifetime he had said a number of times that the home was appellant's and in making improvements and repairs to it had instructed the workmen to look to her for directions. It was unimpeached except by the testimony of O'Connell in regard to conversations with the appellant after Purefoy's death inconsistent with the facts stated by her son and her own claims. The conversations occurred, but the testimony is contradictory as to what was said and as to the fact of the boy's presence. There was some evidence of statements of Purefoy, made in the absence of the appellant after the supposed signing and acknowledgment of the deed, in which he referred to the property as his own and of the payment of taxes by him and the making of repairs and improvements on the house. The possession of the deed from its signing and acknowledgment on July 10, 1926, to October 4, 1927, is not expressly accounted for. It is to be presumed that Purefoy had it during all this time in his possession. No witness testified who saw it, but Purefoy took it with him after its acknowledgment,

and, so far as the evidence shows, retained it in his possession. He died suddenly in the night, and on the day of his death, October 21, 1927, the deed was found in his safety deposit box, where it had been since October 4, the date of his last visit to the box. It had not been in the box before September 30—the day he rented it. The date of the delivery of the keys to the appellant testified to by Frank Herrin, which is relied on as a symbolic delivery of the deed, was two or three weeks before Purefoy's death. It could not have been more than seventeen days, because his last visit to the box was on October 4. He had the keys on that date but not after they were delivered to the appellant, and therefore their delivery to the appellant was after October 4. Statements of the testator before October 4, while the deed was in his possession undelivered, were competent evidence of his intention in regard to the delivery of the deed, but any such declarations after the delivery of the deed, if it was delivered, were merely statements of intention at a time in the past and were not competent to show such past intention for the purpose of invalidating the effect of the delivery.

Counsel have argued with some acrimony the relative credibility of the witnesses—a question which we find it unnecessary to consider because, admitting the facts to have been proved as claimed by the appellant, we do not find they show a compliance with the legal requirements for the delivery of the deed. Upon those facts the only question presented by the record is, Was there a delivery of the deed to the grantee in the lifetime of the grantor?

It is a familiar and fundamental rule of law that a deed, to operate to transfer the title to land, must be delivered. Delivery is the final act on the part of the grantor by which he consummates the purpose of his conveyance, and without it all the other preceding formalities are insufficient to render it effectual as an instrument of title. No special form or ceremony is necessary to constitute a sufficient de-

livery, but something must be said or done showing an intention that the deed shall become operative to pass the title and that the grantor loses all right of control over it. It is indispensable to delivery that the grantor shall part with control over the deed and shall not retain a right to re-claim it. (*Hawes* v. *Hawes,* 177 Ill. 409; *Walls* v. *Ritter,* 180 id. 616; *Hill* v. *Kreiger,* 250 id. 408.) It is not claimed that the deed was actually delivered to the appellant. She never saw it, it was not in her presence, but it is contended that by the delivery of the keys to the safety deposit box and the language of the grantor, "This is your key, and I have made you a deed for this place, and it is in a safe deposit box in the American State Bank. The only way you can get in is to go to Mr. Wochner and he will take you to the man that has the key. He can't get in without you and you can't get in without him," there was a symbolical delivery of the deed and a loss of control over it and of any right to reclaim it. The contract with the bank provided that no one should have access to the safety deposit box but Purefoy or his legally appointed deputy. The possession of the keys by the appellant did not give her access to the deed and did not deprive Purefoy of the right of access to the box and the power of control and right to reclaim the deed. His language, "It is your key, and I have made you a deed for this place, and it is in a safe deposit box in the American State Bank," was consistent with an intention on his part that the deed should presently take effect as a conveyance, but it was not inconsistent with an intention that the deed should remain in the safety deposit box until after his death, when she could find it and have it recorded. The rest of his language, "The only way you can get in is to go to Mr. Wochner and he will take you to the man that has the key. He can't get in without you and you can't get in without him," was consistent with, if it did not indicate, an intention that the box and the deed should remain under his control until his death, when she could get it. The cash-

ier of the bank testified that if Purefoy should come to the bank without the keys to his deposit box and want to get in they would have had to drill the lock of the safety deposit box in order to let him in, and nobody else would be permitted to get in without an order from him. The contract provided that in case of loss of the keys the cost of repairing damage for entry should be paid by the lessee. From all this it appears that the appellant had no right of access to the box or the deed, and the only person who had such right was Purefoy, the grantor, who retained the entire control of the instrument.

The greater part of the argument in behalf of the appellant is devoted to a discussion of the evidence, but conceding the facts to be as the appellant claims them, we must hold that there was no sufficient delivery of the deed. Whatever may have been the intention of the grantor, he had not given the appellant possession of the deed or the means of possession, and he had not himself parted with control over the deed and did retain the power and the right to reclaim it.

In *Hawes* v. *Hawes, supra,* the grantor in his last illness, about two days before his death, gave to his daughter, who lived with him and who was named as grantee in a deed of whose existence she had no knowledge, the key to his private box in a safety deposit vault and the pass-word, telling her, in substance, if anything happened to him to take Kirk and go to the box and get his will but making no reference to the deed. When she went to the box she found a sealed envelope, on the outside of which was written her name and in which was the deed from her father to herself and another deed to herself which had been delivered to her and returned to her father but had not been recorded, and with the deeds a slip of paper on which was written in the handwriting of the grantor and signed by him, "Record your deeds when you open this envelope." This deed had never been delivered to her or anyone for

her use. She knew nothing about it, and it was held that the circumstances did not show a delivery of the deed.

In the case of *Walls* v. *Ritter, supra,* the grantee in a deed produced the key to the grantor's safety deposit box after the latter's death, in which was found a sealed envelope containing the grantor's will and several deeds, among them the one in question in that case, and it was contended that the delivery of the key to the complainant was a symbolical delivery of the deed and manifested an intention of the grantor to deliver it, but it was held that the circumstances did not justify the inference.

The present case comes nearer justifying such an inference than the cases cited, but for the reasons stated it still falls short of showing a delivery of the deed. It does not show an intention on the part of the grantor that the appellant should receive or have possession of the deed in his lifetime, and she did not have possession or the power to get possession in his lifetime. If the grantor intended a gift *inter vivos* he failed to complete it by delivery, which is essential to such a gift.

In the conclusion of the argument for the appellant it is submitted that this gift to her was a case of voluntary settlement, in which a much more liberal rule prevails regarding the actual manual delivery of the subject of the gift than prevails in the case of bargain and sale, the question of the intention of the donor being of much greater importance than the manual possession of the deed. The same argument was made in the case of *Hawes* v. *Hawes, supra,* where the grantee in the deed was the grantor's daughter, and it was held that in case of a deed made as a voluntary settlement the law raises stronger presumptions in favor of delivery than in the ordinary case of bargain and sale; that a delivery of such a deed will be presumed from slight circumstances, and an acceptance will be presumed from the beneficial character of the grant without knowledge by the grantee of the deed. It was said that the deed in question

in that case was of that character, made by a father to his daughter, who was his assistant and secretary, the relations between whom were intimate and confidential, and if there were any circumstances indicating a delivery, the favorable presumptions arising out of their relations and the character of the deed should have due weight although the deed was found in the private box of the grantor after his death. It was, however, held that there was nothing upon which to rest an inference of an intention that the deed should operate as a delivered deed, and that "where the grantor does not lose or intend to lose control over the deed but still continues to have power over the title without the consent of the grantee, there is not such a delivery as the law requires to pass the title."

The present case is not one of voluntary settlement. This case is a mere gift to a stranger. The voluntary settlements in which the more liberal presumption in regard to the delivery of deeds prevails are such conveyances as are made for the benefit of husbands and wives or their children or of other near relatives, for whom the donor may be presumed to wish to provide because of natural affection. In *Chapin* v. *Nott*, 203 Ill. 341, the court said: "In view of the condition of the grantor's family, and the extent of his estate and the manner of the conveyances made, at the time the deed in question was made and delivered to the persons to whom and for whose benefit it was made, it would seem the only reasonable inference that can be drawn from the transaction is that it was a voluntary settlement of his property upon his nearest of kin, and when the question involved is one of voluntary settlement on those standing in close relationship, the same formality and strict compliance with the rule as to delivery is not required. The law has a regard for the relationship of the parties and the motives that are presumed to dictate such conveyances, and the degree of confidence which the parties standing in such relation as donors and donees of valuable property are pre-

sumed to have, and in such case the presumption of law is that there was a delivery, and when brought in question the burden is upon the grantor, or those claiming adversely to the donee or beneficiary, to show clearly that there was no delivery." The present case has none of the features mentioned in the language just quoted. The donor and the appellant were in no way related, and the appellant is entitled to no presumptions except such as arise in any case between strangers. All the cases in which the presumptions in regard to the delivery of deeds arising in cases of voluntary settlements have been recognized are cases of near relationship between the grantor and grantees. Among them are *Heiligenstein* v. *Schlotterbeck,* 300 Ill. 296, *Thompson* v. *Calhoun,* 216 id. 161, *Kirkwood* v. *Smith,* 212 id. 395, *Latimer* v. *Latimer,* 174 id. 418, *Reed* v. *Douthit,* 62 id. 348, *Masterson* v. *Cheek,* 23 id. 72, *Bryan* v. *Wash,* 2 Gilm. 557, and there are many others.

The appellees say in their brief that their cross-bill should not have been dismissed and that they have assigned cross-errors on its dismissal, and they argue that the decree dismissing the cross-bill should be reversed and the circuit court directed to enter a decree in accordance with its prayer. The abstract of the cross-bill consists of the statement that "this cross-bill prays for an accounting of rents and to quiet title." · The cross-errors do not appear in the abstract. No additional abstract has been filed. The rules require the appellant to furnish an abstract of the record sufficient to present every error relied on and allows the appellee to file an additional abstract if the original abstract is incomplete or inaccurate. The appellees did not avail themselves of this privilege. In the absence of an abstract of the cross-bill and the cross-errors the cross-errors cannot be considered.

The decree is affirmed.                     *Decree affirmed.*