**Charlotte Nolan, Appellee, v. American Telephone and Telegraph Company, Appellant.**

**Gen. No. 42,229.**

330

Heard in the second division of this court for the first district at the April term, 1942. Opinion filed June 15, 1945. Released for publication June 27, 1945.

DENT, WEICHELT & HAMPTON, of Chicago, for appellant.

JOSEPH R. ROACH and EDWARD M. KEATING, both of Chicago, for appellee.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

This appeal by defendant, American Telephone and Telegraph Company, seeks to reverse a decree which directed it to issue to plaintiff, Charlotte Nolan, a certificate for 100 shares of its capital stock and to pay her $4,275 in dividends and $633.22 interest on such dividends.

Plaintiff's complaint alleged substantially that on June 12, 1936 certificate G102232 for 100 shares of

American Telephone and Telegraph Company stock was issued to her in her name and that she had been the legal and equitable owner of such 100 shares of stock since said date; that some time between June 12, 1936 and September 2, 1936 "some unknown person obtained possession of the said certificate" without her consent or permission and forged her name to an irrevocable stock power without her authority; that said forgery did not come to her knowledge until on or about July 1, 1937; and that some unknown person or persons presented said certificate of stock along with the forged irrevocable stock power to the American Telephone and Telegraph Company and demanded the issuance of a new certificate in exchange and that defendant accepted plaintiff's forged signature on the irrevocable stock power as genuine and wrongfully and unlawfully issued and delivered to some person other than plaintiff a new certificate for 100 shares of its stock in lieu of certificate G102232.

The complaint concluded with a prayer that defendant be ordered to issue and deliver to plaintiff a certificate for 100 shares of its capital stock and to pay her all dividends declared payable to stockholders of record since July 15, 1936 and interest on such dividends.

Defendant filed an amended answer which specifically denied all the material allegations of the complaint, including the averment that "the irrevocable stock power was forged," and alleged that the signature appearing on said stock power was signed by plaintiff. The amended answer also contained the following allegations:

"Defendant denies that the plaintiff was at any of the times mentioned in plaintiff's complaint, or that the plaintiff now is the equitable owner of one hundred (100) shares of the capital stock of the American Telephone & Telegraph Company, a corporation, represented by stock certificate numbered G102232. De-

fendant admits that certificate numbered G102232 for one hundred (100) shares of the par value of One Hundred Dollars ($100.00) per share was issued by American Telephone & Telegraph Company to Miss Charlotte Nolan, the plaintiff, on June 12, 1936, but alleges the fact to be that the said certificate and the shares of stock represented thereby were at said time and during all the times thereafter, until September 2, 1936, owned by and the property of John J. Nolan, the father of plaintiff, and alleges that plaintiff, during all of said period, held the said stock as the nominee of and for the exclusive benefit of said John J. Nolan.''

In her reply to the amended answer plaintiff denied all of the matters affirmatively alleged therein by way of defense and averred that she ''acquired the stock in her own right and for her own benefit as a gift from her father on June 12, 1936.''

Defendant's theory as stated in its brief is that ''plaintiff's father furnished the consideration for which certificate G102232 was issued in plaintiff's name on June 12, 1936; that he did not give or intend to give the stock to plaintiff, but that on the contrary, he merely caused the certificate to be issued in her name that she might hold it as his nominee for his exclusive benefit; and that in September 1936 plaintiff's father caused the stock to be sold and received the proceeds of sale. The defendant also contends that the signature on the irrevocable stock power is the genuine signature of plaintiff.''

Plaintiff's theory is that her father made a gift to her of 100 shares of American Telephone and Telegraph Company stock on June 12, 1936 by causing certificate G102232 to be issued in her name and that she did not sign the irrevocable stock power pursuant to which defendant cancelled said certificate on September 2, 1936.

The cause was referred to a master in chancery to hear the evidence and to report his conclusions of law and fact to the court.

It appears from the evidence that Charlotte Nolan was a daughter and one of four children of John J. Nolan and Josephine Nolan; that her father and mother were divorced in 1927 and in 1931 her mother married Joseph E. Taglia; that from 1928 to May 1936 John Nolan and Josephine Nolan Taglia were engaged in litigation involving 200 shares of American Telephone and Telegraph Company stock; that Nolan was represented in that litigation by Attorney John F. Higgins and his former wife was represented by Attorney Branko M. Steiner and that as the result of the settlement of that controversy Nolan received a certificate, numbered G101868, for 100 shares of American Telephone and Telegraph Company stock, issued in the name of Josephine Nolan Taglia and indorsed by her in blank; that this certificate was delivered by Attorney Steiner to John F. Higgins, Nolan's attorney, on May 26, 1936; that Nolan caused this certificate to be cancelled and another certificate, numbered G102232, to be issued by defendant on June 12, 1936 in the name of plaintiff; that her father caused the 100 shares' of stock represented by certificate G102232 to be sold and he received the proceeds of the sale; and that certificate G102232 was cancelled by defendant on September 2, 1936.

The evidence presented on defendant's behalf before the master also disclosed the following further facts and circumstances. Nolan had been at one time a comparatively wealthy man. When he received the certificate for 100 shares of American Telephone and Telegraph Company stock in the latter part of May 1936 as the result of the settlement of the litigation with his former wife, his financial affairs were in a precarious condition and he was worried about his

creditors. At the time Attorney Higgins delivered this certificate to Nolan, the latter told Higgins that he was going to have it "transferred into the name of his daughter, Charlotte," who had agreed *"to let me use her name and when the certificate is made out she will endorse that certificate over to any one and in any way and at any time I ask her to do it."*

In the first part of June 1936 Nolan showed certificate G101868 to S. P. Tomaso, vice president of the Prairie State Bank, and stated to him that he wanted it transferred out of the name of Josephine Nolan Taglia as quickly as possible in order to prevent Mrs. Taglia from receiving a dividend due about that time. Nolan also told Tomaso at that time that "he was going to transfer the certificate into the name of Charlotte," who was living with his sister, Mrs. Agnes McCue, and that "he would not have any trouble with her." Thereafter, on June 8, 1936, Nolan brought the certificate to Tomaso at the Prairie State Bank and stated to him that he had decided to put it in Charlotte's name *"for the time being"* and that he wanted it transferred to her. Nolan delivered the certificate to Tomaso for transfer and in lieu of certificate G101868 the American Telephone and Telegraph Company on June 12, 1936 issued certificate G102232 in the name of "Miss Charlotte Nolan." This new certificate was delivered by the defendant to the bank and by the bank in turn to Nolan. Charlotte never had it in her possession nor even saw it until it was shown to her at one of the hearings before the master. In the latter part of June 1936 Nolan applied to Tomaso for a loan from the Prairie State Bank upon certificate G102232. It was understood between Tomaso and Nolan that the latter was making the loan and the question arose as to the manner in which the loan would be made, since the stock certificate was in Charlotte's name. Tomaso told Nolan that the bank would make the loan if the proper instruments were

executed and he gave Nolan a form of irrevocable stock power, a form of power to hypothecate and a form of collateral note with instructions that if he decided to make the loan in Charlotte's name it would be necessary to have her execute the note and the form of stock power and if he decided to sign the note himself, Charlotte would have to execute the stock power and the power to hypothecate. In the early part of July 1936 Nolan brought to the bank stock certificate G102232, the collateral note and the power to hypothecate, the two latter instruments apparently executed by Charlotte Nolan. Nolan did not at that time bring back the stock power executed by Charlotte and when told by Tomaso that he had made a mistake and that it was necessary to have Charlotte execute the stock power, Nolan said that he would have that done and left the bank with all the documents. On July 7, 1936 Nolan returned to the bank with the irrevocable stock power, the authority to hypothecate and the collateral note signed with plaintiff's name and on that date the bank made a 90-day loan of $2,551.31, delivered that amount to Nolan and received certificate G102232 as collateral.

Shortly before September 2, 1936 Nolan told Tomaso that he needed more money and that he was undecided as to whether he would make an additional loan or sell the stock. He then decided to sell the stock and instructed the bank through Tomaso to sell the 100 shares of stock represented by certificate G102232, the bank caused the stock to be sold and the net proceeds of the sale amounting to $17,465.65, less the principal and interest due on the loan, were turned over to Nolan by the bank. Pursuant to the sale, certificate G102232 and the irrevocable stock power were sent to the American Telephone and Telegraph Company and said certificate was cancelled on the records of the defendant and a new certificate was issued to the purchaser of said stock. The loan having been

paid to the bank, it returned the collateral note to Nolan. The Prairie State Bank guaranteed plaintiff's signature on the stock power and Tomaso signed same as a witness to her signature. Plaintiff had an account in the Prairie State Bank and upon opening same had signed her name on a signature card. Before plaintiff's signature on the irrevocable stock power was guaranteed by the bank and witnessed by Tomaso, it was compared with her signature on her account signature card and accepted as authentic.

Mrs. Agnes McCue testified that she was Nolan's sister and Charlotte's aunt; that he lived at her home during the period involved herein and until he died June 29, 1937 and that Charlotte lived with her from March 1935 until the latter part of July 1936, during which period she attended college a short distance from her home in River Forest; that in the latter part of May 1936 "Mr. Nolan told me that he had settled the Telephone stock case, that he was going to get 100 shares of it and *for the time being* he thought he would put it in his daughter Charlotte's name; that the *stock was low,* and as soon as *the stock went up he intended to sell it*"; that subsequently, in the early part of June 1936, in her home and in her presence Nolan "told Charlotte that he was going to put stock in her name temporarily because his creditors were pressing him and he did not want to have it in his name; that *as soon as the stock went up he intended to sell it*"; that Charlotte made no reply to this statement of her father in his presence but that after he left she "complained to me that she did not like the idea of her father putting stock in her name because she was afraid she may get in trouble with the Government on income tax or on inheritance tax."

Mrs. McCue testified further that plaintiff told her about July 5, 1936 that she was going to move from her home and live with a girl friend named Bessie Scully; that Nolan came home later that evening and

she informed him concerning Charlotte's contemplated change of residence; that about two days later she had another conversation with Nolan in her home, at which time he gave her the irrevocable stock power form and some directions in reference thereto; that this took place about "10 or 11 in the morning" before plaintiff had made her appearance downstairs that day; that she took the irrevocable stock power form to plaintiff's room and told her that her father wanted her to sign the stock back to him; that "as long as plaintiff was leaving, he wanted to have the stock signed back *so that when it was up he could sell it*"; that plaintiff told her that "she would gladly sign the stock, that she did not want her name connected with anything belonging to her father"; that Charlotte then signed the stock power in her (Mrs. McCue's) presence; and that after Charlotte signed the stock power she (Mrs. McCue) took it downstairs and handed it to plaintiff's father.

Herbert J. Walter, a handwriting expert, called as a witness by defendant, testified that in his opinion the signature "Miss Charlotte Nolan" on the irrevocable stock power was signed by the same person who signed numerous admitted standards of plaintiff's handwriting.

Charlotte Nolan testified on direct examination that she did not at any time pledge, sell, transfer, encumber or authorize any other person to sell, pledge, transfer or encumber the stock represented by certificate G102232; that she did not indorse said certificate or authorize anybody else to do so at any time; and that she never executed any instrument authorizing anybody else to transfer it.

She testified on cross-examination that she did not sign "Miss Charlotte Nolan" on the irrevocable stock power; that she never saw that document before it was shown to her at the hearing before the master; that she did not know who signed it; and that she had never

seen stock certificate G102232 before it was shown to her at the same hearing and that it had never been in her possession.

After defendant's amended answer was filed, she testified further on cross-examination that "how I first even knew that I owned the stock, the mailman came and I got the mail that day and there was an envelope and . . . on the top it had 'American Bell Telephone Company' . . . it was addressed to me . . . and my father was in the dining room . . . I told him it was addressed to me. In fact, I was rather mystified, and I opened it. It was a dividend check. My father smiled and he said, . . . 'I wanted to surprise you . . . You did not know that you were the owner of stock?' And up until that time I didn't. And he also informed me that he wanted to give it to me and he wanted me to keep it . . . and he told me that he wanted me to have it. That was about all the conversation in regard to it. Previous to that he had mentioned, while that stock was tied up, that if things turned the way he hoped they would he would see that I never had to worry about anything. But I never did question him from that time on . . . I have had conversations with my father but I did not know that he had definitely given it to me . . . until the check came."

She then testified that she placed her indorsement "Miss Charlotte Nolan" on the back of the dividend check and that her father cashed same and returned the proceeds thereof to her; that the first time that her father ever told her that he had given her the stock was after the arrival of the dividend check, which was dated July 15, 1936; that he told her then that he "kept the certificate for safekeeping for me . . . he said he had a box and would keep it there"; that no one was present except her and her father when he told her he had given her the stock; that prior to her conversation with her father at the time the dividend

check arrived about the middle of July, she had numerous talks with him concerning the stock, commencing in January and February 1936; that on one occasion her father came home from Kankakee at "2:00 o'clock in the morning . . . he was very worried. He said he wished this would get straightened out . . . if things turned out the way he wanted them to he would see I never had to worry about anything"; that he spoke to her about the stock several times but that she "could not tell . . . exactly when . . . it all related to the same thing, that he wanted me to have it . . . my dad did mention several times . . . that if things turned out right he wanted me to have it. I don't know whether he was just talking about it or whether he had changed his mind. And as I say, when the dividend check came he told me he had definitely given it to me"; that no one was present at any of the conversations that she had with her father about the stock; that she did not "receive any dividends on this stock except the dividend represented by the check dated July 15th, 1936"; and that "she did not know that she was supposed to receive any further dividends."

Charlotte Nolan further testified that her father did not at any time in or out of the presence of Agnes McCue tell her that he was going to put the stock in her name temporarily because his creditors were pressing him and because he did not want to have it in his own name; that she never told Mrs. McCue at any time that she did not like the idea of her father putting the stock in her name "because she was afraid she might get into trouble with the Government on income tax or inheritance tax"; that Mrs. McCue never asked her to execute any documents with reference to the stock; that she did not tell Mrs. McCue that she would very gladly sign the stock back to her father; that on July 15, 1936, when she got the dividend check, she and her father were talking and Mrs. McCue came

in and "told my father he was a fool, in plain English, and she said he could put the stock in her name, and my father told Mrs. McCue at the time he wanted to give it to me"; that after this conversation she did not have any further conversations with Mrs. McCue with respect to the stock; that she left her father's home the week of July 20, 1936, "because I thought they were very intolerable"; that "Mrs. McCue made it very miserable" and they could not agree on anything; that prior to July 15, 1936 she had no intention of leaving Mrs. McCue's home; that she made up her mind to leave Mrs. McCue's home the week of July 20, 1936; that she then went to live with her mother in Bridgman, Michigan; and that she never told Mrs. McCue that she was going to live with the Scully girl.

James E. Murphy was called as a handwriting expert by plaintiff but he was not asked and he did not give his opinion as to whether the signature on the stock power was the genuine signature of plaintiff. He did testify, however, that in his opinion the "Signature Guaranteed" stamp which crossed the signature "Miss Charlotte Nolan" was placed on the stock power prior to the writing of the signature.

A. F. Adams, who signed the signature guaranty in behalf of the Prairie State Bank and S. P. Tomaso, were called as witnesses by defendant in rebuttal and they both testified that the signature "Miss Charlotte Nolan" was on the stock power before the bank's "Signature Guaranteed" stamp was placed thereon.

On October 26, 1940 the master filed his report, wherein he found: (1) that John J. Nolan was the beneficial owner of the stock and that he received the proceeds of the sale, and (2) that the signature on the irrevocable stock power was the genuine signature of plaintiff; and recommended that plaintiff's complaint be dismissed for want of equity. Plaintiff filed objections to the master's report which were ordered to stand as exceptions. Several hearings were held by

the chancellor on these exceptions and after he had indicated that he was going to enter a decree in conformity with the findings and recommendation of the master, plaintiff filed a petition asking that the cause be re-referred to the master for two reasons: (1) that plaintiff's attorneys had just learned that Branko M. Steiner had a conversation in August 1937 at the Prairie State Bank with S. P. Tomaso (who had testified for defendant on the original reference), wherein Tomaso had told Steiner that he knew nothing about the American Telephone and Telegraph Company stock received by Nolan as the result of the settlement with his former wife; and (2) that her attorneys desired to further interrogate plaintiff's handwriting expert, who had not been asked his opinion as to the genuineness of plaintiff's signature on the stock power, when he testified on the original reference. The chancellor allowed plaintiff's motion and ordered that the cause be re-referred to the master in chancery for further hearing.

On the hearings on the re-reference plaintiff presented the testimony of Attorney Steiner, her sister and her stepfather for the purpose of showing that S. P. Tomaso, vice president of the Prairie State Bank, had told Steiner in effect on August 5, 1937 that he knew nothing about the American Telephone and Telegraph Company stock received by Nolan as a part of the settlement with his wife. This testimony introduced on plaintiff's behalf was so completely refuted by evidence presented by defendant that it would serve no useful purpose to either recite or discuss it.

The only other evidence presented by plaintiff on the re-reference was the testimony of James E. Murphy, her handwriting expert, that in his opinion the signature, "Miss Charlotte Nolan," on the irrevocable stock power was not signed by plaintiff.

The master filed his report on re-reference and in his findings therein he did not even mention any of

the evidence presented thereon except the testimony of plaintiff's handwriting expert, Murphy, which he stated he was unable to reconcile with the testimony of Walter, defendant's handwriting expert, given on the original reference. He further stated in his report that the testimony of Walter and Murphy was so hopelessly contradictory and conflicting "as to have been of no aid to the master in determining the question of the genuineness of the signature of plaintiff on the irrevocable stock power." It was then stated in the report that the master had disregarded the testimony of Tomaso because "of his general demeanor as a witness and because of his false statement in writing that the instrument [stock power] was signed and delivered in his presence." Tomaso did appear as a witness on the re-reference but his testimony was confined to a denial of his alleged conversation with Steiner on August 5, 1937. As already stated, the testimony introduced on plaintiff's behalf as to this purported conversation was so completely refuted that the master did not even mention it in any finding in his report and therefore nothing occurred on the re-reference to justify any adverse finding by the master as to Tomaso's general demeanor as a witness or as to any testimony given by him on the original reference.

The master also found in his report on re-reference that "the witness Agnes McCue gave indication on the witness stand and during the proceedings as being quite biased and hostile toward her niece, Charlotte Nolan"; and that "plaintiff was just past twenty-three years of age at the time her testimony was given and appeared to be a frank and truthful person and gave her testimony in a frank and straightforward manner, and her frankness was just as evident during a severe cross-examination as it was when questioned by her own attorneys." Neither Mrs. McCue nor Charlotte Nolan testified on the re-reference and

the record discloses nothing that occurred on the re-reference that could possibly account for the master's change of opinion as to the credibility, demeanor, bias or hostility of Mrs. McCue or of Tomaso or of the frankness or truthfulness of Charlotte Nolan since he filed his report on the original reference.

The master then found that the signature appearing on the irrevocable stock power was not the genuine signature of plaintiff. He did not, however, change his finding contained in his report on the original reference that plaintiff's father was the beneficial owner of the stock in question and had received the proceeds of the sale thereof and he did not change the recommendation made in his original report that plaintiff's complaint be dismissed for want of equity. Objections filed by defendant to the master's report on re-reference and by plaintiff to his report on the original reference were ordered to stand as exceptions. The trial court overruled defendant's exceptions to the report on re-reference, sustained plaintiff's exceptions to the report on the original reference and entered the decree in favor of plaintiff from which this appeal is taken.

There were two questions before the chancellor for determination: (1) whether or not Nolan during his lifetime made a gift of the 100 shares of stock involved herein to his daughter, Charlotte, and (2) whether or not plaintiff signed the irrevocable stock power, authorizing her father to pledge and sell such stock. Since Nolan was unquestionably the owner of this stock when he caused it to be transferred to plaintiff on the books of the defendant company and a new certificate issued in her name on June 12, 1936, such transfer constituted a constructive or symbolic delivery of the stock to her (*Chicago Title & Trust Co. v. Ward*, 332 Ill. 126), and since it is presumed that when a father transfers or delivers property belonging to him to his daughter a gift of same is in-

tended, the burden was on defendant to prove that Nolan did not intend to make a gift of the stock to plaintiff. On the second question it was incumbent upon plaintiff to prove that her signature was forged on the irrevocable stock power.

Defendant first contends that the trial court "erred in rejecting the master's recommendation that plaintiff's complaint be dismissed for want of equity and in decreeing, contrary to the master's finding, that plaintiff is the equitable owner of the stock," because (1) "the finding in the decree that plaintiff is the equitable owner of the stock is against the manifest weight of the evidence, which shows beyond doubt that plaintiff's father caused the certificate to be issued in plaintiff's name merely as his nominee" and (2) "the absence of intention on the part of plaintiff's father to make a gift of the stock in question prevents the transaction from constituting a gift."

As heretofore indicated, the facts disclosed by the evidence heard by the master on the original reference and the findings in his report in respect thereto convinced the trial court that Nolan was the equitable owner of the stock when he caused it to be sold and that he caused the certificate to be issued in Charlotte's name merely as his nominee. It was only because the chancellor was so convinced that plaintiff sought the re-reference. Not a particle of evidence was presented to the master on re-reference that could or did actuate him to change or modify the finding in his report on the original reference that Nolan was the equitable owner of the stock at the time he sold it.

While it is true that when a father delivers property of his to his daughter a presumption of fact arises that a gift of same was intended, it is also true that such presumption is not conclusive and may be rebutted by proof. Intention to give being just as essential to a completed gift as delivery of the subject matter thereof and defendant claiming that Nolan

did not intend to make a gift of the stock in question to Charlotte, it was incumbent upon it to show Nolan's absence of intention to make a gift of the stock to her by clear and convincing evidence. We are satisfied that defendant met its burden and that the evidence shows unmistakably and beyond doubt that Nolan did not intend to make a gift of the stock to plaintiff but that he intended to and did place it in her name merely for the purpose of having her hold it as his nominee and for his benefit.

Just what is the factual picture presented here? Nolan's financial affairs were in bad shape and he was worried about his creditors. After 8 years of litigation with his former wife he received in settlement a certificate for 100 shares of defendant's stock, which had been issued to Josephine Nolan Taglia and indorsed by her in blank. Between the time he received this stock certificate in the latter part of May 1936, and June 12, 1936, when he caused it to be cancelled and a new certificate issued in plaintiff's name, Nolan told Attorney Higgins, Tomaso, his banker, and Mrs. McCue, his sister, that he intended to place the stock in Charlotte's name as his nominee and for his benefit. According to Attorney Higgins, Nolan also told him that Charlotte had agreed to hold the stock for him until he (Nolan) wanted to sell it. According to Mrs. McCue, Nolan told Charlotte in her presence prior to June 12, 1936 that he was going to put the stock in her (Charlotte's) name until its price went up and he desired to sell it. After the certificate was issued in Charlotte's name on June 12, 1936 it was delivered through the bank to Nolan. He continued to treat the stock as his own and, requiring funds in the early part of July 1936, he applied to the bank for a loan on the stock. He procured this loan on July 7, 1936 by delivering the certificate of stock to the bank as collateral along with a stock power, a power to hypothecate and a collateral note ostensibly executed by plain-

tiff. According to Charlotte, she did not even know on July 7, 1936, when her father made the loan at the bank, that the stock certificate had been issued in her name. Nolan still continued to treat the stock as his own, when he caused it to be sold by the bank on September 2, 1936 and received the proceeds of the sale.

Plaintiff's claim is based solely on her uncorroborated testimony that when the dividend check arrived through the mail about July 15, 1936, made out in the name of "Miss Charlotte Nolan," she told her father that she was "mystified" and that then he said, "I wanted to surprise you . . . You did not know that you were the owner of stock"; and that he also said that he wanted to give it to her, wanted her to keep it and wanted her to have it. It must be remembered that prior to the time of this purported conversation on July 15, 1936, her father, in making the loan on July 7, 1936, had already pledged the stock certificate and no longer had it in his possession and that, according to plaintiff, he had forged her signature or caused it to be forged on the stock power, the power to hypothecate and the collateral note.

Her counsel attempt to portray plaintiff as an inexperienced school girl and unfamiliar with business affairs in June and July 1936. However, she had a bank account of her own for a considerable period prior to that time and, according to her own testimony, she knew when the check arrived on July 15, 1936 that it was a dividend check. Although plaintiff's father did not die until June 29, 1937, she admitted that she made no inquiry of him concerning the certificate of stock in question or dividends payable thereon subsequent to July 15, 1936 and that she made no inquiry of defendant in relation to same prior to August 1938.

Plaintiff's testimony that her father told her on July 15, 1936 that he had made a gift of the stock to her stands alone and uncorroborated by a single fact

or circumstance in evidence. On the other hand a reputable lawyer, a reputable banker and plaintiff's aunt testified positively that Nolan told them on separate occasions between the latter part of May and June 12, 1936 that he intended to have certificate G101868 transferred and a new certificate issued in plaintiff's name for the purpose of having her hold same for him. None of these witnesses have any personal interest in the case and their testimony stands uncontroverted and unimpeached. Certainly there is no reason disclosed by the record why Attorney Higgins, Tomaso or Mrs. McCue would commit perjury to aid the defendant and to injure plaintiff. Aside from the direct testimony of these witnesses that Nolan told them that he did not intend to make a gift of the stock to plaintiff, in the light of all the other facts and circumstances in evidence it is highly improbable that Nolan would litigate eight years to obtain this stock and then immediately give it to plaintiff, and this is especially true when it is considered that Nolan's financial affairs were in a precarious condition at the time and he had manifested worry about his creditors. The fact that it would have been improvident for Nolan to have given away the stock is a strong indication of his intent not to make a gift of it to plaintiff. It is also highly improbable that plaintiff's father would inform her that he had made a gift of the stock to her after he had already pledged it as collateral for a loan, and certainly he would not have so informed her if, as plaintiff claims, he had already forged her signature or caused it to be forged in connection with the loan. It is neither plausible nor credible that plaintiff would make no inquiry with reference to dividends on the stock during the year her father lived after the certificate was issued in her name and almost for an additional year after he died, if she understood on July 15, 1936 that the stock had been given to her by her father. It is not plausible that Attorney Steiner,

who then represented plaintiff and her sisters and brother, would have made a search for the certificate of stock in question as an asset of her father's estate in August of 1937, if plaintiff believed that she owned the stock.

██ ██ In sustaining plaintiff's exceptions to the original report of the master and in finding that she was the beneficial owner of the stock, the chancellor held that the statements of his intention in regard to the stock made by plaintiff's father to Attorney Higgins, Tomaso and Mrs. McCue out of the presence of plaintiff were incompetent as being hearsay and should therefore be disregarded. Defendant insists that Nolan's statements of intention to the foregoing witnesses "made contemporaneously with or shortly prior to his causing the certificate to be issued in plaintiff's name were admissible and that it was error to eliminate such testimony as hearsay."

The statements of Nolan to these witnesses shortly prior to or contemporaneously with the issuance of the certificate in plaintiff's name, even though made out of her presence, were unquestionably competent and admissible to show that he did not intend to make a gift to her of the certificate or of the stock represented by it. The rule applicable to evidence such as that under consideration is clearly stated in Restatement of the Law of Trusts, vol. II, sec. 443, at p. 1357:

"a. *Admissibility of parol evidence to rebut the inference of a gift.* Where one person pays the purchase price for property which is transferred at his direction to another who is a natural object of his bounty, parol evidence is admissible to show that the payor intended that the transferee should not have the beneficial interest in the property, even though the property transferred was an interest in land and the Statute of Frauds is in force. The intention of the payor not to make a gift to the transferee may be

shown not only by oral declarations of his intention, but also by the circumstances under which the transfer is made. Thus, the fact that it would be improvident for the payor to make a gift to the transferee is an indication that he did not intend to make a gift. So also, the fact that the circumstances are such that the payor would have a reason for taking title in the name of another other than an intention to give him the beneficial interest is an indication that he did not intend to make a gift; as, for example, where the payor had reasons for wishing that it should not be known that he was purchasing the property.''

It has been repeatedly and uniformly held in this and other jurisdictions that prior or contemporaneous declarations of an alleged donor are admissible to show that a particular transaction was not intended as a gift, intent being a distinct and essential element of a gift (*O'Donnell v. O'Donnell*, 303 Ill. 31; *Herrin v. McCarthy*, 339 Ill. 530; *Dodge v. Thomas*, 266 Ill. 76; *Whitney v. Wheeler*, 116 Mass. 490; *Commonwealth v. Trefethen*, 157 Mass. 180; *Lee v. Mitcham*, 98 F. (2d) 298; *Chichester Chemical Co. v. United States*, 49 F. (2d) 516; 28 C. J., sec. 80, p. 675; and McKelvey on Evidence, Third Ed., sec. 154, p. 306).

In *Mutual Life Ins. Co. v. Hillmon*, 145 U. S. 285, a leading case on this subject, the court said at p. 295:

''A man's state of mind or feeling can only be manifested to others by countenance, attitude or gesture, or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. When the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention. *But whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by*

*contemporaneous oral or written declarations of the party.*

"The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact, as his own testimony that he then had that intention would be. *After his death there can hardly be any other way of proving it;* and while he is still alive, his own memory of his state of mind at a former time is no more likely to be clear and true than a bystander's recollection of what he then said . . . ." (Italics ours.)

Plaintiff's counsel apparently convinced the trial court that the case of *Chicago Title & Trust Co. v. Ward*, 332 Ill. 126, was of controlling importance on the question of Nolan's intention to make a gift of the stock to plaintiff, since in a written opinion filed by the chancellor in deciding this case, he seemed to rely strongly on the *Ward* case. That case has no application to any controverted issue in this case. It is controlling only on the proposition that causing a stock certificate to be transferred on the books of a corporation constitutes constructive or symbolic delivery to the transferee. The constructive delivery of the stock certificate to plaintiff is admitted here but defendant insists that Nolan in making such delivery had no intention of making a gift of the stock to her.

The numerous authorities cited clearly establish the competency and admissibility of the testimony of Attorney Higgins, S. P. Tomaso and Mrs. McCue as to Nolan's statements to them of his intention in respect to the stock in question and, in our opinion, if the chancellor had not erroneously disregarded this testimony as hearsay, he could not have reached any other conclusion than to confirm the finding of the master in his report on the original reference that

Nolan was the beneficial owner of the stock and as such properly received the proceeds of its sale.

Plaintiff's counsel argue at length that defendant is not relieved of an admission made in its original sworn answer to the complaint because of the fact that it later filed an amended answer in which the admission was not made. The complaint alleged that plaintiff "is and was at all times since June 12, 1936, the legal and equitable owner" of the stock in question. The first paragraph of the original answer was in part as follows:

"Defendant denies that plaintiff is now or has been at any time since on or about September 2, 1936 the legal and equitable owner of the 100 shares of capital stock of defendant represented by certificate G102232."

It is true that the allegation of the complaint that plaintiff was the beneficial owner of the stock at all times since June 12, 1936 was not specifically denied by the original answer but neither was it specifically admitted that plaintiff was such beneficial owner during the period alleged. The defendant did not intentionally and explicitly admit that plaintiff was ever the beneficial owner of the stock and the most that can be said of the claimed admission is that by reason of the defendant's failure to specifically deny plaintiff's beneficial ownership, such beneficial ownership was constructively admitted by operation of section 40 of the Civil Practice Act (par. 164, ch. 110, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 104.040]). After it had been shown to the trial court that, when defendant filed its original answer, it did not have knowledge of the facts in connection with the issuance of the stock certificate in plaintiff's name on June 12, 1936, and that it first learned the facts in reference thereto in March 1940, it was granted leave to file an amended answer, wherein it specifically denied that

plaintiff was the beneficial owner of the stock at any time. Plaintiff did not offer the original answer in evidence. In *City Nat. Bank & Trust Co. of Chicago v. Oberheide Coal Co.*, 307 Ill. App. 519, we said at p. 522: "The better rule would seem to be that an abandoned pleading should be offered in evidence by the party wishing to have it considered an admission." In any event, defendant's admission in its abandoned original answer was not conclusive but merely adverse evidence and it was entitled to little, if any, consideration, inasmuch as the evidence considered in its entirety shows conclusively that plaintiff was never the beneficial owner of the stock.

We are impelled to hold that the finding in the decree that plaintiff is and was at the time her father sold it the beneficial owner of the 100 shares of American Telephone and Telegraph Company stock involved herein is against the manifest weight of the evidence and that the chancellor erred in failing to confirm the finding in the report of the master on the original reference that Nolan was the beneficial owner of the stock in question and in rejecting the master's recommendation that plaintiff's complaint be dismissed for want of equity.

Since under the law a beneficial owner of stock may use it as his own (*Gahagan v. Whitney*, 359 Ill. 419, 423) and since the stock was issued in plaintiff's name merely as the nominee of her father and he, the beneficial owner, received the proceeds of the sale, she is not entitled to a decree in her favor, even though she did not sign the stock power. However, we will consider defendant's contention that "the signature on the irrevocable stock power is the genuine signature of plaintiff and the decree and master's report on re-reference, wherein said signature is found to be a forgery, are against the manifest weight of the evidence."

It will be recalled that the master's report on the original reference found that "the signature on the irrevocable stock power was the genuine signature of plaintiff," that in his report on the re-reference he found that "the signature appearing on the irrevocable stock power was not the genuine signature of plaintiff" and that he reached the latter conclusion by disregarding the testimony of the handwriting experts for both parties as being irreconcilable and hopelessly contradictory and conflicting, by disregarding the testimony of Tomaso because "of his general demeanor as a witness and because of his false statement in writing that the instrument [stock power] was signed and delivered in his presence," by disregarding the testimony of Mrs. McCue because she appeared to be "quite biased and hostile toward her niece" and by finding that plaintiff "appeared to be a frank and truthful person."

As already shown, neither Mrs. McCue nor plaintiff testified at all on the re-reference and, while Tomaso did appear as a witness on the re-reference, his testimony consisted solely of a denial of a purported conversation Attorney Steiner claimed to have had with him. Attorney Steiner's testimony as to this conversation was completely refuted by evidence presented by defendant. Therefore nothing occurred in respect to Tomaso or his testimony on the re-reference that warranted the master in disregarding his testimony on the original reference because "of his general demeanor as a witness." Tomaso testified on the original reference that plaintiff did not sign the stock power in his presence but that after comparing her signature on the stock power with her signature on her signature card on file at the bank in connection with her savings account he accepted it as authentic.

Tomaso also testified on the original reference that in his opinion the signature on the stock power was the genuine signature of plaintiff. Mrs. McCue testified on the original reference that she saw plaintiff sign the stock power under the circumstances hereinbefore related. Obviously the master believed the testimony of Tomaso and Mrs. McCue on the original reference as to the genuineness of plaintiff's signature on the stock power, since he found in his report on the original reference that "the signature on the irrevocable stock power was the genuine signature of plaintiff."

While the master found in his report on re-reference, upon which plaintiff did not testify, that she was frank and straightforward in her testimony on the original reference, he obviously was not so favorably impressed with her frankness when he found in his report on the original reference that she did sign the stock power, notwithstanding her testimony that she did not sign it. We might add that, after a careful examination of the complete transcript of plaintiff's testimony, we are not impressed with her frankness.

Included in the record are twelve admitted signatures of plaintiff and her disputed signature on the stock power. As to the comparison of signatures it was said in *Fekete v. Fekete*, 323 Ill. 468, at p. 482: "In arriving at a conclusion by comparison we are in as good a position to arrive at a correct result as the chancellor . . . ." During the course of the hearings on plaintiff's exceptions to the report of the master on the original reference the chancellor after comparing the signature on the stock power with plaintiff's admitted signatures made this statement: "I have been looking at the signatures and you admit this is her signature, and not being a handwriting expert but at least having a layman's experience and observation, I would say they were one and the same."

Five of plaintiff's twelve admitted signatures were written by her before she conceived the idea of instituting this suit and the signature on the stock power is strikingly similar to those five signatures. The other seven admitted signatures were written by plaintiff after she decided to bring this action—two of them were signed to her complaint and the other five were written by her at the suggestion of defendant's counsel at one of the hearings before the master on the original reference. All seven of these signatures, in our opinion, show a deliberate effort on the part of plaintiff to disguise her handwriting. At least four of the specimens of plaintiff's signature that were written before her complaint was filed and the signature on the stock power were written with a so-called ball pen or one that was rather stub nosed. Unquestionably appreciating this fact, when plaintiff was asked to sign her name before the master, she insisted on writing her signature with a sharp pointed pen. We think that, notwithstanding plaintiff's obvious attempt to disguise these seven signatures, the signature on the stock power resembled them in general appearance and has numerous characteristics in common with them. At least it can be said that these seven signatures are no more dissimilar to the signature on the stock power than they are to her other admitted signatures.

This brings us to the consideration of the testimony of the handwriting experts which the master disregarded and which contains a mass of minute details too extensive to set out in an opinion. We have carefully examined all of the testimony of Walter, defendant's handwriting expert, and find that it was of the type aptly characterized by the Supreme Court in *Fekete v. Fekete, supra,* where it was said at p. 483: " . . . the opinion of an expert may be of great value where it calls the attention of the court to facts which are capable of verification by the court which

the court otherwise would probably have overlooked, and the opinion of the expert is based upon such facts and is in harmony therewith." We think that the master in his report on re-reference and the chancellor in passing upon such report improperly disregarded Walter's testimony that in his opinion "the signature 'Miss Charlotte Nolan' on the irrevocable stock power was signed by the same person who signed numerous admitted standards of plaintiff's handwriting."

In addition to the foregoing there are numerous circumstances in evidence that would seem to preclude the total lack of necessity on the part of Nolan to forge plaintiff's signature on the stock power or to cause it to be forged. Charlotte was on good terms with her father on July 7, 1936, when he made the loan, and, according to her testimony, she did not know at that time that the stock had been issued in her name. *Certainly Nolan in that situation would have had no fear of plaintiff refusing to comply with his request to sign the stock power and would not have elected to forge her signature or cause it to be forged rather than to request her to sign that instrument.*

It was incumbent upon plaintiff to prove that her signature was forged to the stock power and again we find that the only direct evidence presented by her in support of such charge was her own uncorroborated testimony as an interested witness. The only other evidence presented by her was the opinion evidence of her handwriting expert, Murphy, who should not even have been permitted to testify on the re-reference, because it is admitted that the omission of plaintiff's counsel to ask his opinion on the original reference as to the genuineness of the signature on the stock power was not inadvertent but deliberate and intentional. In any event, we have carefully examined his testimony and find that it was based principally upon hypothesis. It was therefore of little value and we are not impressed with it.

It is difficult to understand why the master in his report on re-reference reversed the finding in his report on the original reference that the signature on the stock power was plaintiff's genuine signature, since nothing occurred on the re-reference that could possibly justify such reversal, even though the testimony of both of the handwriting experts was eliminated from consideration.

It is interesting to note that the theory of fact of plaintiff's *verified* complaint was not that her father owned the stock and made a gift of it to her but rather that some unknown person obtained possession of the stock certificate without her permission, forged her signature to the stock power and sold the stock. It was not until defendant's investigation disclosed her father's ownership of the stock and the circumstances under which he caused the stock certificate to be issued in her name and alleged such facts and circumstances in its amended answer that plaintiff was driven to take the position in her reply to the amended answer that her father made a gift of the stock to her.

After plaintiff's reply was filed there was no longer any question in this case of an unknown person obtaining possession of the stock certificate without her permission and forging her name to the stock power. She was then confronted squarely with the proposition of admitting that she signed the stock power or accusing her father of forging her signature thereon or causing it to be forged. Plaintiff chose the latter course and did not hesitate to brand her dead father as a felon in her attempt to recover on what has been shown to be an unjust claim.

We are compelled by the facts to hold that the finding and adjudication in the decree that the signature on the stock power was not the genuine signature of plaintiff are against the manifest weight of the evidence.

Other points are urged and numerous authorities cited, which we have considered, but in the view we

take of this case we deem it unnecessary to discuss them, since, to do so, would only serve to further lengthen this already long opinion.

For the reasons indicated herein the decree of the superior court of Cook county is reversed and the cause is remanded with directions to enter a decree dismissing plaintiff's complaint for want of equity.

*Decree reversed and cause remanded with directions.*

FRIEND and SCANLAN, JJ., concur.